# THE BERRY WILL CASE.*

*Wills—Caveat—Mental Capacity of Testator—Expert Evidence—Hypothetical Questions—Assumption of Facts—Insufficient Grounds For Opinions of Experts—Testimony of Non-Expert Witnesses as to Capacity of Testator—Subscribing Witnesses—Instructions to the Jury—Dismissal of Issues.*

The testimony of alienists or experts as to the mental capacity of a person whom they did not examine must be based strictly on the facts actually proved by witnesses in the cause and not upon the conjectures or inferences of witnesses; and although a hypothetical question to such experts may not be improper merely because it includes only part of the facts offered in evidence, yet it would be so if by reason of the omission the question fails to present the facts in their true relation.

Upon the trial of an issue under a caveat to a will relating to the mental capacity of the testator, the caveators put to their expert witnesses a long hypothetical question, alleged to summarize the evidence in the case as to acts and omissions by the testator, and as to statements made by him on various subjects. The experts were asked in the question to "assume that the statements so made were erroneous and were so made because of a misconception on the part of the testator;" and in regard to some of the incidents mentioned they were asked to assume that what was done or omitted to be done was "because of his mental condition." *Held*, that the question is improper because it assumes that a misconception is an insane delusion, also because it gives a wrong coloring to certain facts by withholding other facts which were testified to and related to the former, and also because some of the incidents narrated in the question were not established by the evidence.

A question to an expert witness set forth that the testator had made certain statements and the witness was asked for his opinion upon the assumption that the statements so made were erroneous and were made because of a misconception on the part of the testator. *Held*, that the question is incompetent because, if the word "misconception" be treated as meaning a delusion, (as it was understood by some of the experts) then the question assumes the thing to be proved, since the existence of delusions is proof of mental unsoundness, and there was no direct evidence in the case that the testator labored under insane delusions; also because if the word "misconception" is to be taken as meaning mistake, then it is not competent for an alienist to draw the

---

*The docket title of this case was *The Safe Deposit and Trust Co. of Baltimore, Executor of George R. Berry*, vs. *Louisa C. E. Berry, Wm. J. Berry and others*.

conclusion that a man is incapable of making a will because he had
been mistaken as to the existence of certain facts.

One question asked the experts set forth that at the beginning of testa-
tor's last illness he was sitting on a chair in his library and mumbled,
"Yes, yes, um, um," and said to his servant, "I want to go to my
chair." The servant said : "You are in your chair." He replied, "No,
I am not." The servant said : "Do you want to go on the lounge ?"
and he said "yes;" and when he got there said : "Take me to my
lounge." The question then proceeded : Assume that this conduct of
the testator was caused by the attack, and that he was not aware of the
statements he made as to his chair and lounge. One of the medical
experts replied to this question that he would suppose the attack was
embolism of the brain. Another expert said that the facts in the ques-
tion indicated physical and mental degeneration which caused the for-
mation of an embolism or thrombosis in the brain, producing an at-
tack of delirium, the words he mumbled being characteristic of a man
with brain trouble. Other evidence in the case showed that it was a
long-established habit of the testator to say, "yes, yes, um, um." His
attending physician, summoned at the time of said attack, testified that
on this occasion the testator was suffering from retention of urine and
was made himself again by the use of a catheter. *Held,* that the ques-
tion was faulty because it gave a wrong coloring to the facts mentioned
by withholding others which explained them.

In another question to the experts, reference was made to interviews in
which the testator was represented as having said that he would make
provision by will for his relatives and as having criticised certain men
for the testamentary dispositions they had made ; and the witnesses
were invited to "assume that the alleged testator was a truthful man
and intended at the time he made said statements to carry them out,
and that nothing occurred thereafter to appear or change his relations
with said persons, and that he did not provide for them in accordance
with said statements—what indication does that furnish ?" *Held,* that
the question should not have been allowed, first, because there was not
only no evidence in the case to show that nothing had occurred to
affect his relations with these persons, but there was ample evidence
that the testator had had good reason for changing his feelings towards
some of those persons, and, second, because these relatives were all
nephews and nieces, and it does not follow that a man's intellect is im-
paired because he changes his purpose in regard to the disposition of
his estate without changing his relations with collateral kindred to whom
he had previously intended to give some of his estate.

A hypothetical question to an expert should not assume that the testa-
tor's alleged failure to comprehend a conversation with a third party
was due to his "condition of mind," since such failure might be owing
to the stupidity of the third party ; or, if owing to the testator's "con-
dition of mind," that condition might have been caused by then exist-

ing distress, and the conclusion there from that he was incompetent to make a will is unwarranted.

A witness testified that in a conversation of some thirty minutes with the testator, he jumped from one subject to another. A question, founded on this evidence, was put to an expert who answered that "the fact of his inability to confine his mind to one continuous subject was evidence of mental impairment." *Held*, that the question was improper since it assumes the existence of an inability on the part of the testator to adhere to one subject from the fact that in a certain conversation he did not confine himself to one subject.

The physical condition of a testator, such as inability to control his locomotion, produced by age, disease and grief, is not *per se* proof of impaired mental power, and evidence relating to such physical condition alone is consequently insufficient to support an expert opinion as to his mental capacity.

It is not competent for a witness, who is neither an expert nor a subscribing witness to the will, to express his mere opinion as to the capacity of the testator.

But a non-expert witness may give in evidence his view of the testator's mental condition after showing that he had means of knowing what that condition was and stating facts sufficient to constitute a basis for the conclusion on the subject which he offers in evidence.

A non-expert witness to whom the testator had loaned money testified that, in response to his request for an extension of time, the testator refused, saying that he could not get household expenses without selling stocks, and that he (the witness), had heard of people who, on account of their state of mind, were afraid they would have to go to the poor house. *Held*, that this evidence was inadmissible.

The circumstances mentioned by certain other non-expert witnesses, who were allowed to express their opinions as to the capacity of the testator, set forth and held to be insufficient to justify them in giving their opinions in evidence.

It is not competent for such a witness to express his view as to the testator's mental condition founded merely upon his physical condition, or upon the circumstance that, being an old man the testator was forgetful of names and recent occurrences while vividly recalling earlier events.

Evidence as to the physical condition of the testator in his last illness' weeks after the execution of the will in controversy, is not admissible.

A witness should not be allowed to express the opinion that the testator was "very childish in his manner," without any further explanation or description of his manner.

One of the facts mentioned by a witness as forming the basis for his testimony as to the testator's capacity was that when on one occasion he

asked for a loan the testator said that he did not know how his affairs were, did not know if he had a dollar, etc. The statement so made was not true in fact. *Held*, that if the testator believed his statement to be true it was a delusion, but it cannot be assumed to be such in the absence of evidence to that effect; that if not believed, then a falsehood uttered to get rid of an importunate borrower, though not morally justifiable, is not evidence of insanity, and that consequently the witness was not warranted in expressing an opinion as to testator's mental capacity founded upon this circumstance.

When the Orphans' Court has sent to a Court of law for trial issues involving questions of fraud and undue influence in procuring the execution of a will, as well as testamentary capacity, the caveators were allowed, after the testimony was taken, to dismiss all of the issues, except that relating to capacity. *Held*, that this was error, and that the caveatees were entitled to require the jury to find upon all of the issues.

Upon the trial of an issue relating to testamentary capacity, the trial Court instructed the jury that the opinions of the subscribing witnesses were of no more weight than the opinions of other witnesses of equal intelligence and equal knowledge of the matters as to which both classes of witnesses testified. *Held*, that this instruction was erroneous and misleading, because it eliminates all consideration of the credibility of the witnesses as well as the distinction made by the law between the evidence of subscribing witnesses and other witnesses.

A prayer which gives prominence to the opinions of the medical experts concerning the capacity of the testator, and directs the jury to consider them in connection with the other evidence is misleading, because the jury may suppose that they must be controlled by those opinions if they believed the facts upon which the opinions purported to be founded.

Appeal from the Superior Court of Baltimore City (HARLAN, C. J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Wm. Pinkney Whyte* and *Edgar H. Gans* (with whom was *Charles E. Hill* on the brief), for the Safe Deposit and Trust Co., executor, appellant.

*Thomas R. Clendinen* and *William Colton*, for Louisa C. E. Berry *et al.*, appellees.

McSHERRY, C. J., delivered the opinion of the Court.

This case arose out of a caveat filed against the will of the

late George R. Berry, and was tried entirely on the issue involving his mental capacity. The tendency to assail last wills upon the ground of mental incapacity and by frivolous and inconclusive evidence, chiefly of a speculative character, whenever the testator has not disposed of his property in a way to suit disappointed and, often, distant and distasteful relations, has grown to such alarming proportions in late years, that the Courts should be resolute in adhering to the old and long-settled principles of the law respecting the admissibility of evidence, allowing no relaxation or refined modifications of them in this class of cases ; if last wills and testaments are to be at all upheld by juries. It is no uncommon thing to see testamentary dispositions questioned, and it sometimes happens that they are successfully questioned, though there never had been a suspicion of the testator's capacity during his lifetime, nor after his death, until the contents of his will became known and the expectations of collateral kindred were defeated by its provisions. These kindred frequently think they ought to have been the objects of his bounty, and because *he* thought differently they conclude he was incapable of intelligently thinking at all. Because what *he did* does not comport with what *they* believe he *should have done*, they assume he was mentally unsound and forthwith attack his will; though they never doubted his ability to make a will until they discovered that he had made one which ignored or dissatisfied them. It is time that such groundless assaults should cease and it is the plain duty of the Courts to give them no encouragement or countenance.

There are forty exceptions in this voluminous record. Of these *sixteen*, namely, the *nineteenth* to and including the *thirty-fourth*, relate to the admissibility of hypothetical questions propounded to medical experts on the subject of mental capacity ; *twenty-one*, namely, the *second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, thirty-fifth, thirty-sixth, thirty-seventh* and *thirty-eighth*, relate to rulings on the admissibility of non-expert testimony on the same subject ;

*two*, namely, the *thirty-ninth* and *fortieth* cover rulings on prayers for instructions to the jury ; whilst the *first* concerns the action of the Court in allowing the *third* and *sixth* issues to be dismissed by the plaintiffs after the jury had been sworn. It will not be practicable to discuss separately at any length these distinct questions. The general principles respectively applicable to the two groups into which all the exceptions pertaining to the admissibility of evidence are divisible, will first be considered and then the relevancy or irrelevancy of each question in the light of those principles, will be briefly pointed out ; though in dealing with the prayers and the first exception, a slight divergence from this method will be necessary.

George R. Berry made and executed his will on the tenth day of February, eighteen hundred and ninety-nine, and died on March nineteenth, following. His estate according to the appraisement, made as required by law, amounted to something over seventy-three thousand dollars. The will contains thirty-six bequests beside a residuary clause. To his own relations he gave sundry sums aggregating nine thousand, two hundred dollars. To the relations of his deceased wife he gave altogether twenty thousand, five hundred dollars. To friends of his wife and to his own friends he gave nine thousand dollars. To his servants he gave forty-three hundred dollars. To the Boys' Home he gave fifteen hundred dollars. To the Home of the Aged, two thousand dollars, and to the Woman's College the residue of his estate.

The contest was commenced after the will had been probated, and the caveators, who are nephews and nieces of the decedent, were made plaintiffs, whilst the Safe Deposit and Trust Company of Baltimore, named in the will as executor, was made the defendant. Six issues were framed and transmitted by the Orphans' Court to the Superior Court of Baltimore City for trial. Of these the *first* has relation to mental capacity ; the *second*, to knowledge of the contents of the will ; the *third*, to its execution ; the *fourth*, to undue influence ; the *fifth*, to fraud in its procurement, and the *sixth* is, as to whether the will is his last will.

George R. Berry was seventy-eight years and four months of age when he died. The immediate cause of his death was *pyæmia*; the remote cause was atony of the bladder. He was taken sick on February the twenty-third. Atony of the bladder was followed by catarrh of the bladder, which extending up into the kidneys caused *nephritis*. The semi-comatose condition which resulted from the *pyæmic* poison did not supervene until March the seventeenth, or two days before his death. He had been an active, energetic and successful business man. For many years he had been engaged quite extensively in manufacturing bricks, and by his industry and capacity had accumulated the property of which he was possessed at the time of his decease. He had held positions of trust and responsibility, both public and private. He had been, we are told, a member of the General Assembly and of the City Council and a director of the Baltimore and Ohio Railroad Company, of the Maryland Penitentiary and of the Firemen's Insurance Company, besides having served on the grand jury probably more frequently than any other individual in Baltimore. There is no pretence that he was not perfectly competent to transact business or to make a valid deed or contract up to the date of the death of his second wife. Physically, he seems to have been a hale and vigorous man. But it is alleged a change came over him upon the death of his wife in November, eighteen hundred and ninety-seven; and it is from this event that it is asserted his mental faculties began to fail. There is no doubt this calamity greatly depressed him; but if the question were before us to be determined on the evidence in the record, we feel bound to say that we see nothing in all that has been testified to, to indicate that this great sorrow or any other cause seriously impaired his intellect or deprived him of the capacity to make a valid will. He had been devotedly attached to his wife and seems to have been on more intimate terms of friendship with *her* relations than with *his* own. The will in contest was not the first he had executed. During the life of his wife he had signed a will wherein many of the legatees named in the caveated will were provided for, and wherein the Woman's

College was also made residuary legatee. After the death of his wife he executed other wills ; and the record shows in all these instances that he acted with particularity, circumspection and intelligence. Whilst it is not for this Court to pass on the question of his mental capacity at the date of the execution of the contested will, because that is exclusively the province of the jury, we cannot, in disposing of the exceptions, close our eyes to the circumstances which overwhelmingly demonstrate that he had an intelligent appreciation and understanding of the thing he was doing when he made his will. Nor can we overlook the fact that in opposition to this, reliance is placed chiefly on vague theories and speculative opinions to impeach his sanity. If there ever was a will made with deliberation and after careful preparation, the evidence, if worthy of credence at all, shows that the will of February the tenth, was so made. The will was prepared by Mr. John W. Marshall, Second Vice-President of the Safe Deposit and Trust Company, and was written from *data* furnished by Mr. Berry some days previously, and those *data* included a former will. The memoranda given to Mr. Marshall were fully explained by Mr. Berry. Upon the margin of the old will he had pencilled the alterations he wished to have made and he stated his reasons for making those changes. After the will had been written it was sent to Mr. Berry on February the eighth, and two days later he went with it to the office of the Safe Deposit and Trust Company where he formally executed it. He then placed it in his box in the vault of the company where it was found after his death. On the day he signed the will and after he had signed it he went to the Mercantile Trust Company's office and there transacted some business in relation to stock which he held in the Baltimore City Passenger Railway, and subscribed for twenty-two thousand dollars of the first consolidated mortgage bonds of the United Railways and Electric Company of Baltimore. From there he went to the Continental Bank and upon his return home he made concerning the railway stock transaction an entry upon a sheet of paper which was found between the leaves of his ledger. Two of the subscribing witnesses to the

will testified most emphatically that he was at the time he signed it thoroughly capable of making a valid deed or contract. We have failed to find the testimony of the other subscribing witness in the transcript. This is the man whose mental capacity has been challenged; and these are the circumstances under which the assailed will was executed. Now, by what kind of evidence is this assault supported? This brings us to the several exceptions.

After a number of non-expert witnesses had narrated incidents in the life of Mr. Berry, a long and complicated hypothetical question covering *thirteen* pages of the printed record was propounded to certain medical experts; and then the same question was broken up into subdivisions and these subdivisions were also put to the same witnesses. The defendant objected to the admissibility of the question and the answer, and also to the admissibility of each subdivision of it; but the Superior Court overruled those objections and thereupon the exceptions numbered from *nineteen* to *thirty-four* both inclusive were reserved. Those exceptions though not first in order of time, for convenience, will be first considered.

Observation and experience teach that there is danger of reaching inaccurate conclusions as to a testator's mental capacity if much reliance is placed on expert testimony founded exclusively on mere hypotheses. The expert not having seen the individual about whose sanity he speaks must rely solely on hypothetical statements of facts assumed to have been deposed to by other witnesses, which facts may have been colored by the persons who narrated them or may be erroneously interpreted in their presentation to the expert, whilst the expert himself may be mistaken in the deductions he draws even when the facts have been accurately rehearsed. Added to these sources of uncertainty there is, and probably it is quite natural that there should be, more or less unconscious bias towards the side upon which the expert is employed; and as a consequence it is no unusual thing to see equally intelligent and equally honest experts arriving at diametrically opposite conclusions from precisely the same hypotheses. This anom-

aly is not confined to alienists but exists amongst experts on handwriting and on other subjects as well. It is for all these reasons, of the utmost importance, when the testator is not present to speak for himself, or to be seen by the jury, or to be personally examined as to his mental condition, that especial care be taken by the Courts to restrict within the narrowest limits consistent with settled rules of law, this hazardous species of evidence.

Now, as the opinion sought from the expert must have relation to the subject-matter being inquired into, it is obvious that it must be based on the facts proved, or tending to prove which there has been some evidence offered. It cannot be founded on the mere naked conjectures, conclusions or inferences of witnesses because those conjectures, conclusions or inferences might not represent the real conditions which existed, and thus, there might be substituted by the expert for a deduction which he could have properly drawn from the facts as they really were, precisely an opposite conclusion at variance with the facts and utterly false, because deduced from erroneous premises. This Court has said in *Williams* v. *The State*, 64 Md. 394: "Now, while an expert may give his opinion upon facts assumed to have been established, it would be against every rule and principle of evidence, to allow him to state his opinion upon the conclusions and inferences of other witnesses." If this be so, then much more is it certain that it would be improper to ask an opinion on a conjecture or conclusion or inference, not of a witness, but of the counsel who propounds the interrogatory. It is because the very object of allowing an hypothetical question to be asked is to get the expert's opinion on the actual facts as they have been proved, and not upon some different state of circumstances which bear no relation to the real situation, that the "question to an expert witness testifying as to a person's mental condition about which he has no personal knowledge, should contain such assumptions of facts, and such only, as counsel may fairly claim that the evidence in the case tends to justify, and * * * while such a question may not be improper because it in-

cluded only a part of the facts in evidence, it would be so if, by reason of omission, it manifestly failed to present facts which it did include in their just and true relation, and caused them to appear in one that was untrue and unjust." *Barber's Appeal*, 63 Conn. 393; s. c., 22 L. R. A. 90. It is perfectly self evident that a question which assumes as one of its postulates the very thing which it is propounded to prove, is essentially inadmissible.

The hypothetical question set out in the *nineteenth* exception and covering thirteen printed pages and which was answered in the *twentieth* exception, contains twenty-one distinct incidents, ten of which detail statements made by Mr. Berry on various subjects, and the residue relate to acts done by him, or to omissions on his part to do other acts. At the close of each of the ten paragraphs having reference to his *statements*, the expert witness was asked to "assume that the statements so made were erroneous *and were so made because of a misconception* on the part of the alleged testator." At the close of some of the other incidents the expert was asked to assume that what was described was "because of his (Mr. Berry's) *mental condition*;" whilst in others the expert was asked to assume that "nothing occurred thereafter to affect or change his relations with" certain individuals therein alluded to. Without setting out these incidents further than may be done later on by way of illustration, it is perfectly apparent, as will be seen in a moment, that the objection to the question should have been sustained for at least three conclusive reasons.

First. What is meant by "misconceptions" as used ten times in the question? It may mean a delusion or it may mean a mistake which implies the existence of a rational and capable intellect in the person making the mistake and therefore excludes a delusion. That it may have the former meaning is clear from the testimony of Dr. Hill, who when asked to take into consideration the assumption "that the statements were erroneous and were made because of a *misconception* on the part of the alleged testator," replied: "The only

inference we can draw from it is that they are delusions; if there was no foundation for it, it was a delusion." Question: "If it was erroneous it was a delusion?" Answer: "Yes." Question: "What sort of a delusion would you say that was, doctor, sane or insane?" Answer: "*All delusions are insane.*" A *misconception* is thus distinctly and unqualifiedly treated as synonymous with a *delusion.* Giving to the word that meaning, the question is made to assume as proved the very thing which it was propounded to prove. If a delusion is evidence of a mental disease, then the *assumption* that an individual had delusions is necessarily an assumption that he had a mental disease, whilst the fact to be proved, and therefore not to be assumed, is that he had a mental disease. A question which assumes as proved the precise and identical thing *to be* proved is essentially vicious. An hypothetical question may assume as true facts which evidence has been offered to prove; but it obviously cannot assume as true, either the ultimate thing to be proved or things which there has been no evidence whatever adduced to establish. As the ultimate thing to be proved was that Mr. Berry had no capacity—mental capacity—to make a valid will, the assumption that he had had delusions was an assumption, pure and simple, that he did not have the mental capacity to make a valid will, because the existence of delusions is evidence of the absence of mental capacity. Substituting for the word *misconceptions* the meaning ascribed to it by Dr. Hill the question would read: Assuming that Mr. Berry had delusions, had he delusions and was he, therefore, mentally competent to make a will? Such a question would be radically wrong. By assuming the existence of delusions, the question assumed what had not been proved as is manifest from the ruling by the learned Judge below on the plaintiffs' *twelfth, thirteenth, fourteenth, fifteenth* and *fifteen and a half* prayers, each of which was constructed on the theory that Mr. Berry had had insane delusions but which were all objected to specially, on the ground that there was no evidence in the case "showing that George R. Berry labored under any in-

sane delusion," and which were thereupon rejected by the Court. Thus while the hypothetical question assumed that 'Mr. Berry had had delusions, the Court by rejecting the prayers above indicated, practically ruled that there was no evidence to show that there ever had been such delusions. But this is not all. Translate the word misconception to mean mistake; is it permissible for an alienist to draw the conclusion that a man is incapable of making a valid will if it be assumed that sometime in his life he has been mistaken as to the existence of a fact or a number of facts? Assuming that the testator has made a mistake then that mistake is attributed by the witness to mental incapacity. Tested by such a process no human being would be found capable of making a will.

What has been thus far said is sufficient to show that the rulings set out in the *twenty-third, twenty-fourth, twenty-fifth, twenty-seventh, thirty-first* and *thirty-second* bills of exceptions were wrong and no further discussion of them will be necessary, because in each of those exceptions portions of the original hypothetical question were propounded and when propounded were coupled with the same assumption as to misconceptions on the part of Mr. Berry.

Secondly. Still dealing with the *nineteenth* exception—the question was faulty in giving a wrong coloring to facts, and this wrong coloring was given by isolating a particular fact and withholding other facts which directly bore upon and explained the one so segregated and thus so made unduly prominent. A single illustration will make this clear. One paragraph of the question reads as follows: "The attack in his last illness took place while he was sitting in his library; he did'nt say much, but mumbled, and looked up to the ceiling saying 'yes, yes, um, um; yes, yes; um, um;' and his servant being alarmed kept close so that she could reach him if he attempted to rise, and send for a doctor. At this time the alleged testator said: 'I want to go to my chair'. And the servant said to him, 'You are in your chair;' and he replied to her, 'no, I am not.' And she said to him, 'do you want to go on the lounge?' And he said 'yes.' And then she

helped him to the lounge, and when he got on the lounge he said, 'Take me to my lounge.' She said, 'You are there now.' This was the very beginning of his sickness. Assume that the conduct of the alleged testator as just described was caused by the attack, and that he was not aware of the statement made in reference to his lounge and chair as herein mentioned." . To this part of the hypothetical question the medical expert replied as follows: "From the description of that attack in your question I would suppose that was an attack of embolism of the brain." Another expert made this answer: "It indicates to my mind that degeneration, the physical and mental degeneration of the individual, caused the formation of an embolism or thrombosis in the brain, and that produced an attack of delirium ; and his saying, yes, yes, yes, and um, um, um,' is a characteristic of a man with brain trouble." Now, it had been proved by the plaintiffs prior to the hypothetical question being propounded, that it was a habit of long standing with Mr. Berry to say 'yes, yes, um, um.' A nephew in narrating an interview in eighteen hundred and ninety-one, when it is not pretended that Mr. Berry had embolism, thrombosis or delirium, testified that he had stated certain things to his uncle and when he, the witness, left, all Mr. Berry "said, if anything, was, umph, umph ; umph, umph. * * * * He said umph, umph ; umph, umph, as I have heard my uncle say hundreds of times, umph, umph, umph, umph, just as if he was sitting in his office talking business." This practice of his to say umph, umph, was entirely excluded from the question. Can it be conceived that these learned experts would have attributed to embolism these utterances if they had been told in the question put to them that Mr. Berry habitually used them ? It is folly to suppose they would, and it could have been no less absurd if they had. And yet a conclusion attributing to him a serious mental condition was reached because a material and most important fact revealing the habit of many years was suppressed. But beyond all this, the assumption of facts contained in this branch of the question was founded

wholly upon hearsay testimony and therefore should not have been incorporated in the question at all. As showing the utter unreliability of the conclusions drawn from this inaccurate hearsay hypothesis, let us glance for a moment at the actual facts about which there can be no controversy. When the region of speculation is abandoned and bald realities are considered, the situation is completely changed. The testimony of the physician who attended Mr. Berry for some years as well as in his last illness, is of more value on this subject than all the conjectures of all the experts examined in the cause. Dr. Morgan described Mr. Berry's condition and the attack to which allusion is made in the question. This testimony was delivered after the hypothetical question had been put and answered. He said he received a hurry call, went to Mr. Berry's house and found him in his library. "He was suffering from retention of urine, caused by atony of the bladder, and was suffering intensely. I relieved his suffering by withdrawing the water. * * * * * I. withdrew the water and in half an hour he was himself again." Thus the supposed embolism turned out to be a distended bladder, and the suggested thrombosis vanished on the use of a *catheter.*

Thirdly. The hypothetical question based some of the incidents it narrated on an assumed condition of fact not proved; or else it arbitrarily attributed to the *condition* of his mind other events that it recited. Thus in part of the question, and this is repeated in the *twenty-sixth* and *twenty-eighth* exceptions, allusion is made to interviews in which he is represented as having said that he would make provision for his relatives, and in which he is further represented as having criticised Samuel Ready and Johns Hopkins for the manner in which they had disposed of their estates; and thereupon the expert witnesses were asked to assume "that the alleged testator was a truthful man and intended at the time he made said statements to carry out the same, *and that nothing occurred thereafter to affect or change his relations* with said persons, and that he did not provide for them in accordance with his said

statements   *   *   *   *   what indication does that furnish,
or what is to be learned from that?" And the answer was
that this indicated a serious impairment of memory. There
was not a particle of evidence adduced to show that nothing
had occurred to affect or change his relations towards those
persons, but there was ample evidence that he had good rea-
son for changing his feelings towards some of them, and thus
the very pith of the hypothesis was assumed as an existing
fact, not only in the absence of testimony to support it, but in
the teeth of testimony contradicting it. But further than this,
it may be granted that nothing in fact had occurred to change
his relations towards his relatives and yet it would not thence
follow that the testator's memory had failed or that his intel-
lect had become impaired. There is an obvious fallacy lurk-
ing in the opposite conclusion. These relatives were all col-
lateral kindred, no nearer than nephews and nieces. A man
may change his intentions with respect to the disposition of
his property without changing his relations or feelings towards
the collateral kindred to whom he previously proposed to
give some of that property. His relations towards those per-
sons may remain precisely as they had formerly been, and
yet other considerations may induce him to make an entirely
different disposition of his property. Unless it be assumed as
a postulate true without exception, that a change of intention
as to testamentary disposals of property when there has been
no change in one's relations towards another is essentially in-
dicative of a loss of memory and consequently of impaired
mental power, and of itself excludes every other explanation,
there can be no rational inference drawn from such a circum-
stance that there was lack of testamentary capacity. If a
medical expert is to be permitted to testify before a jury that a
testator's mind had seriously degenerated because, though
there was no change in his relations towards his collateral kin-
dred, he yet made a different disposition of his property from
the one he had formerly stated he intended to make, there
would be little chance of any will being sustained; and the
right to make one had as well be unconditionally denied by

legislative enactment. The question wholly ignored the evidence which had been adduced before the question was propounded and which tended to prove that there had been ample cause for a change in the testator's feelings and relations towards some of his relatives ; and by thus ignoring this evidence submitted a false hypothesis.

This branch of the hypothetical question was palpably wrong and for the same reasons so were the subdivisions of it objected to in the *twenty-sixth* and *twenty-eighth* exceptions.

By another portion of the hypothetical question an alleged failure of the testator to comprehend a conversation was assumed to be due to "his condition of. mind ;" and this is repeated in the *twenty-ninth* exception. It is obvious that this assumes as true the very thing to be proved. Again : It might have been that this supposed failure to comprehend the conversation was due to other circumstances than the "condition of his mind," or if due to the condition of his mind that the condition of his mind was not a condition of incapacity but of distress. Granting that it was due to the condition of his mind, the conclusion that that condition was one of incapacity was utterly unwarranted. It is altogether probable that his supposed failure to comprehend the conversation was the consequence of his visitor's lack of intelligence. If the visitor was himself stupid and incapable of expressing himself clearly then *that* lack of intelligence should not be the measure of Mr. Berry's mental grasp. The *thirtieth* exception rather indicates that whatever failure there was on the part of Mr. Berry to comprehend the conversation was attributable to the visitor himself. This is the incident. The day after the death of Mr. Berry's wife an officer of the lodge of Odd Fellows to which Mr. Berry belonged called on Mr. Berry to pay him the sum of twenty dollars—the amount he was entitled to receive from the lodge as benefits. The lodge officer stated the object of his visit, and as the *twenty-ninth* exception sets. it out "a lady in the room explained to the alleged testator the purpose for which the money was paid after the lodge officer tried ineffectually to explain this purpose." If he un-

derstood the lady and did not understand the lodge officer it is a fair inference, not that there was mental deficiency on the part of Mr. Berry, but that the lodge officer was unable to intelligently communicate the object of his visit. This assumption that Mr. Berry failed to understand the reason why the money was paid, and failed to understand it because of his mental condition, made the hypothetical question bad, and also affects the interrogatory put in the *twenty-ninth* exception, and the one propounded in the *thirtieth* which is dependent on the *twenty-ninth.*

For the reasons we have assigned the hypothetical question set out in the *nineteenth* exception should not have been allowed to be asked. The objection to it ought to have been sustained. What has been said up to this point disposes of the *nineteenth*, *twentieth*, *twenty-third*, *twenty-fourth*, *twenty-fifth*, *twenty-sixth*, *twenty-seventh*, *twenty-eighth*, *twenty-ninth*, *thirtieth*, *thirty-first* and *thirty-second* bills of exception and shows that the questions objected to in each of them and the answers given in reply should have been excluded.

The remaining exceptions which relate to expert testimony are the *twenty-first*, *twenty-second*, *thirty-third* and *thirty-fourth;* and these will now be considered.

The *twenty-first* exception was taken to the ruling of the Court in allowing an hypothetical question founded on the testimony of Dr. Harris to be propounded to an expert. The foundation for the question is this: In an interview of twenty or thirty minutes' duration between the testator and Dr. Harris, who is not an expert, the former is said to have jumped from one subject to another without any continued conversation on any one of those subjects. The expert's answer shows the danger of admitting such evidence as the expert gave, for it completely shifted the ground on which the question was based. This is the answer: "The fact of his *inability* to confine his mind to one continuous subject was evidence of mental impairment, a very common symptom in old age." The hypothesis of the question did not include an *inability* "to confine his mind to one continuous subject"—possibly the

witness meant *one subject continuously*—but was limited to an assumption that Mr. Berry *did not* confine himself to one subject. Thus the fact that he passed abruptly from one subject to another was assumed to imply an *inability* to adhere to one subject; and this assumption in the answer plainly indicates that the question as put was not sufficiently explicit to warrant the formation of an opinion at all. It was inadmissible, and should have been ruled out.

There was error in the ruling set forth in the *twenty-second* exception. This is the question objected to : " Doctor, taking into consideration everything that has been stated to you about Mr. Berry's physical condition and sickness, and also taking into consideration the statements that have been made about his walking, or failure to control his walk and locomotion, assuming those statements to be true, what indication, if any, is there to be gathered from such condition of locomotion ?" Now, amongst the things which had been stated to the witness as facts assumed to have been proved about Mr. Berry's physical condition was the following : " Assume the physical condition of the alleged testator as described, was caused by old age and disease and the death of his wife." It cannot be said that the mere *physical* condition of Mr. Berry, produced by age and by disease and by grief, is, without more, any evidence of his *mental* condition, unless it be conceded to be universally true that a physical condition, pure and simple, caused in the way designated, invariably and always indicates mental degeneration. But to assert such a proposition is to assert, as everyone knows, a sheer absurdity. The remaining part of the question as to Mr. Berry's alleged inability to control his locomotion was without sufficient facts to support it, and therefore furnished no ground upon which to build an opinion. And this was recognized by the expert himself when he answered that Mr. Berry's " locomotion has not been sufficiently carefully described to draw a very distinct inference ;" although after making this statement he proceeded to speculate as to what might have produced a disturbance of his gait or walk. The objection to the question ought to have been sustained,

because the question included a false assumption, as just pointed out, and because it sought an opinion upon what was obviously, and by the witness was conceded to be, an insufficient description to support an inference.

The *thirty-third* and *thirty-fourth* exceptions were reserved to rulings admitting questions founded on the whole hypothetical question, and for that reason the objections to them ought to have been sustained. If the hypothetical question was wrong, then any other question which assumed and relied on the errors contained in the former was equally defective.

The hypothetical question is entirely different from the one propounded in *Frush* v. *Green*, 86 Md. 494. Upon turning to the record in that case it will be found that the method followed was to ask the expert whether he had heard all the testimony which had been delivered, and upon his replying in the affirmative, he was then asked, assuming the facts testified to, to be all true, to give his opinion as to the party's mental capacity. This was the course adopted in *Negro Jerry* v. *Townshend*, 9 Md. 145, though not with the entire approval of the Court.

We now come to the twenty-one exceptions embodying questions propounded to non-expert witnesses. The law applicable to such testimony will be briefly stated and then the exceptions will be considered as concisely as possible. Whilst, as said by this Court, in *Waters* v. *Waters*, 35 Md. 542, "it may be difficult to lay down any precise rules defining the basis on which such testimony ought to rest," still there are some definite principles which, though they have "in some instances * * * * * been lost sight of or greatly relaxed," are nevertheless applicable to this class of testimony and ought not to be overlooked or further departed from when considering its admissibility. It has been distinctly ruled in this State and is generally agreed that *mere opinion*, unless it be the opinion of the subscribing witnesses to a will or the opinion of a medical expert, is not competent evidence to prove mental capacity or incapacity. " It ought to appear " as stated in *Waters* v. *Waters, supra*, " that the witness had an oppor-

tunity of forming a rational opinion, and the facts deposed to by him ought to be such as in some manner to indicate the mental capacity of the testator, and to furnish to the witness rational ground for an opinion on that subject." Or, as expressed in *Townshend* v. *Townshend*, *7* Gill, 28: " The impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance and acts of the testator in *various business transactions, for a long series of years*, is not mere opinion, it is *knowledge.*" This was quoted with approval in the recent case of *Crockett* v. *Davis*, 81 Md. 151. It s not strictly accurate to say that a non-expert witness other than a subscribing witness, may give his *opinion* as to a testator's mental capacity, though usage has sanctioned the expression. If he has the means of *knowing* what that mental condition is, then after disclosing those means, so as to show, both that he possesses them and that they are adequate, he may state the *result*, not as opinion, but as knowledge, precisely as he may do when questions of personal identity or of handwriting are involved. This result, is "in its essence, only fact at shorthand." *Conn. Ins. Co.* v. *Lathrop*, 111 U. S. 620. There must be a basis shown for the formation of a *rational* conclusion which is not a mere conjecture, but is knowledge. Hence, if that basis is trivial or insufficient, or does not furnish in the judgment of the Court, an adequate ground to support such a conclusion as amounts to knowledge, the witness should not be permitted to express any conclusion at all. Facts must be stated so that it may be seen whether the conclusion deduced from them by the witness has any relation to, or can be fairly said to be dependent on them.

There were quite a number of witnesses who were asked and were allowed to give their opinions as to Mr. Berry's mental capacity. With the exception of three, none of those whose testimony on this point has been objected to, ever had had any business transactions with him, and those who did have will be mentioned later on. Apart from the medical experts and those persons who had not the slightest foundation for the formation of any rational conclusion on the subject, the only

witnesses who deposed that Mr. Berry was mentally incompetent to make a will, were, first, those persons who will get his property if the will should be annulled, and secondly, those more remote kindred who were either not provided for at all in the will, or else were not as well provided for therein as they think they ought to have been.   We will now proceed to an examination of the various exceptions relating to this subject.

The *second* exception was taken to a ruling of the Court in permitting a question to be put to Dr. Donivan, who is a druggist and not a medical expert.   The witness had testified at length and amongst other events that he narrated was the following: In April, eighteen hundred and ninety-one, Mr. Berry had loaned Dr. Donivan, who was the husband of one of his nieces, the sum of three hundred and fifty dollars. The note given at the time was repeatedly renewed.   Finally Mr. Berry proposed that the doctor should divide the note into three new ones, suggesting that it would be easier for him to meet it in that way.   When one of these notes matured Dr. Donavin called on Mr. Berry.   The latter greeted him cordially and stated that he was glad to see him and began making inquiries as to the names of the doctor's children.   In a little while the doctor said to Mr. Berry "Now George, I have come here on business today.   I can't meet this note and I wish you would renew it."   Mr. Berry replied: "My God, that I can't do ; I can't get household expenses without selling some stocks or something of that kind."   In reference to this remark the witness deposed, in effect: "I didn't know he was under the impression that people do get sometimes ; sometimes people get under an impression of that kind."   The witness was then asked: "What sort of people get under an impression of that kind?"   This question was objected to and without being answered or ruled on, the following was substituted: "You have said that sometimes people get an impression of that kind ; to what sort of people do you refer?   You say sometimes people get an impression of that kind ; the impression he has spoken about was the impression that he was hard up, was hard up for money, and that he would be obliged

to sell some stock or bonds in order to get money for household expenses.    Now, this gentleman says sometimes people get an impression of that kind.    I want to ascertain what is the extent of his knowledge now on that subject, of what sort of people get an impression of that kind."    The trial judge ruled that the witness might explain his previous answer, and this was substantially, if not in form, a ruling which disallowed the defendants objection, and thereupon the *second* exception was taken.    The explanation given by the witness was that he had *heard* of people, worthy people, who are afraid that they will have to go to the poor-house and that this was due to their state of mind.    It was a palpable error to allow the witness to be asked the question objected to and it was no less an error to permit him to make the explanation he did.    He was not a medical expert and even if he had been he should not have been allowed to give mere *hearsay* evidence.    Whilst entitled to give his knowledge as to the mental capacity of the testator, if sufficient foundation had been laid to enable him to testify on the subject, he had no right and should not have been suffered to put an interpretation on the exclamation used by Mr. Berry when the latter refused to again renew the note. His explanation amounted simply to an interjection of his construction of Mr. Berry's language, when it was for the jury and not for the witness to determine its meaning and significance. In fact, the explanation was a construction founded solely upon what the witness had *heard* as to *other* people who were afraid they would have to go to the poor-house.    It was wholly inadmissible.

The *third* exception relates to the testimony of William J. Berry, one of the plaintiffs.    He was asked to give his opinion as to his uncle's mental capacity and he did so, and the inquiry is:    Did he state sufficient facts to warrant him in forming a judgment on that subject?    He narrated no business transactions with Mr. Berry and his opinion was based solely upon conversations at two interviews, one in June and the other in November, eighteen hundred and ninety-eight.    These interviews show that Mr. Berry was intelligent and that his

conversation was perfectly sensible.   He was mistaken in the
identity of a watch but at once recollected the facts when
reminded of them, and he was unable to recall who Lizzie
Berry was, but when told she was a sister of the witness and
was named Elizabeth Helen Berry, he remembered her.   He
had, according to the witness, lost flesh and was physically
weaker than in former years.   During one of these interviews,
which took place prior to the date of the will in contest,
Mr. Berry told the witness that he had provided for him in his
will, and he obviously referred to some other will because the
one in controversy had not been made, and the witness
remarked : "If it is possible to prolong your life I would pre-
fer what you have set aside for me, sir, you should live to
spend every dollar of it," and Mr. Berry then said : "William,
that is well spoken, but there are others that would like me
to close my eyes this very night."   There is not a fact in the
testimony of this witness to justify him in drawing the infer-
ence that the testator had no capacity to make a valid will,
and the question objected to should have been excluded.

The *fourth*, *fifth* and *sixth* exceptions embody the testi-
mony of Mrs. Waterson, another plaintiff.   During the course
of her testimony she said that Mr. Berry "impressed me
(her) as being very *childish in his manner*."   The defendant
interposed and moved the Court to strike out that observa-
tion, but the motion was overruled and hence the *fourth* ex-
ception.   There was error in this ruling.   The statement
was a mere ambiguous and indefinite opinion.   *Waters* v.
*Waters, supra.*   It conveyed no intelligent meaning.   Did it
signify that his manner was like or characteristic of a child's,
or that it was silly or weak ?   A perfectly intelligent person
may sometimes act in a childish manner, that is in an unsus-
pecting and confiding way, but that would be no indication of
mental decay.   If the witness meant that the manner of Mr.
Berry was silly, she should have said so and should have
described it.   Mrs. Waterson had seen her uncle but once
between eighteen hundred and eighty-one and March the
third, eighteen hundred and ninety-nine, and that was in

eighteen hundred and ninety-eight. She was asked in the *fifth* exception whether on March the third, eighteen hundred and ninety-nine, and, therefore, after the will had been made, he was capable of making a will. When she saw him on March the third, eighteen hundred and ninety-nine, he was confined to his bed and he died on the nineteenth. She held no conversation with him and could not, therefore, know what was the condition of his mind, but he *whined* when she entered the room. What this whining had to do with his mental capacity on the tenth of the preceding month is difficult to divine ; for it is not pretended by any one that he was in the same condition physically when he made the will, that he was in when this witness saw him on March the third. In the *sixth* exception she undertook to base an opinion as to his mental powers on his *physical* condition. "I should judge," she said, "when a man is broken down physically he will mentally become weak also." But it was held in *Higgins* v. *Carlton & Scaggs*, 28 Md. 115, that "neither age nor sickness, nor extreme distress, nor debility of body, will affect the capacity to make a will if sufficient intelligence remains." This was the language of the caveatee's seventh prayer in that case, and this Court held that that and several other prayers, contained "familiar principles of law, so firmly established by numerous and uniform decisions, that it is now too late to call them into question." It is clear, then, that Mr. Berry's mere physical condition furnished no criterion by which to judge his mental capacity. The questions in both the *fifth* and *sixth* exceptions should have been excluded because the witness had not shown that she had the qualifications required to enable her to answer them.

The *seventh* and *eighth* exceptions contain the testimony of Mrs. Miller, a daughter of Dr. Donavin. She undertook to give an opinion based upon a single interview that took place in January or February, eighteen hundred and ninety-eight. Mrs. Miller, her husband, and her little boy Donavin, were present. Mr. Berry during the visit said : "Little fellow, what is your name ?" Mrs. Miller testified that she was sur-

prised and that she remarked : "Don't you know his name ? We have called him for my father." Mr. Berry replied: "Oh, yes, Donavin." Shortly afterwards, during the same interview, Mr. Berry called the boy *Solomon*. Mrs. Miller said, his name is not Solomon ; and Mr. Berry replied : "I know it is not Solomon." In a little while he again called the boy Solomon, whereupon Mrs. Miller said, presumably to her husband : "He seems to have some difficulty in remembering the boy's name," and Mr. Berry answered, "So I do.   *   *   * I can't remember well ; I can't remember well, my head is not the same it used to be." This is the foundation for Mrs. Miller's opinion that George R. Berry was not capable of making a will; and it was a totally insufficient foundation.

The *ninth* and *tenth* exceptions embrace the testimony of Samuel C. Eichelberger. This witness saw Mr. Berry on three occasions ; first, in the month of November or December, eighteen hundred and ninety-seven, and afterwards in March, eighteen hundred and ninety-nine. On the first occasion, this is what transpired: "I said to Mr. Berry that I wanted to give him a check for the death of his wife, and he seemed to me, he could not realize what I was after ; it seemed that he could not write the receipt and asked some one else to write the receipt. He said he could not write a receipt and directed some one else to do it. I paid him twenty dollars, the allowance for the death of a wife in our lodge. When I went there I told him what I came for, I told him I had this money, but he was unable to write the receipt and got some one to do it for him. I stayed there from fifteen to twenty minutes. He seemed very feeble, a very feeble state of affairs, didn't want to talk ; didn't want to have anything to say. I attempted to talk to him about the purpose of my trip and found it was no use. It was a feeble state I found him to be in. Apparently the feeble state of his mind. There was some one or two explained it by this lady, but there wasn't any conversation." The second interview took place in March, a few days before Mr. Berry died. The witness had been appointed by the lodge of Odd Fellows, a committee to visit Mr. Berry.

"I went," said the witness, "in the evening between eight and nine o'clock. * * * I saw Mr. Berry lying in bed. Couldn't have any conversation for blubbering and would not talk; apparently wanted to cry, or was crying. I went to his bedside and told him what I was there for, and got no answer, except blubbering; remained there about fifteen minutes." The following week the witness carried Mr. Berry's sick benefits again, and found him worse, he couldn't say anything "and was sinking apparently to me." The witness had not been personally acquainted with Mr. Berry prior to paying him the twenty dollars in November or December, eighteen hundred and ninety-seven. Upon this slender foundation the witness was permitted to give an opinion that Mr. Berry was not capable of making a valid deed or contract either in November or December, eighteen hundred and ninety-seven, or in March, eighteen hundred and ninety-nine. It needs no discussion to show that the rulings in these two exceptions were wrong.

The *eleventh* exception relates to the testimony of Edgar A. Lyon. In eighteen hundred and ninety-one or ninety-two, this witness visited Mr. Berry and paid him five weeks sick benefits due to him as a member of Mechanics Lodge of Odd Fellows. The conversation was confined to the business that took the witness to Mr. Berry's house. In eighteen hundred and ninety-eight, Mr. Berry paid to the witness twenty-five dollars, which sum settled his dues to the lodge for two and a-half years in advance. Several times afterwards Mr. Berry met the witness and asked him how his, Mr. Berry's account with the lodge stood. This circumstance, contrasted with the former interviews, is the sole foundation for the opinion which the witness gave that he did not believe Mr. Berry could recollect what he had put in the first part of the will after he had drawn it; and that he was mentally not fit to make a will. The opinion was without a sufficient foundation.

The *twelfth* exception contains a question put to Dr. Samuel A. Bell and the facts upon which it was founded. The witness, though a physician, was not an alienist and did not

attend Mr. Berry professionally. He based his opinion on two transactions and one other interview. The first business transaction took place in eighteen hundred and ninety-five, when Mr. Berry loaned Dr. Bell fifty dollars. This sum was repaid. In November, eighteen hundred and ninety-eight, Dr. Bell sought another loan, the amount of which has not been stated and was told by Mr. Berry that he, Mr. Berry, was not in a condition to transact any business of that character; he said he was not well. He was in an excited condition. "He told me," said the witness, "that he did not know that he had a dollar in the world; he said his affairs, he did not know how they were, and how they were mixed up, and he could not tell anything about it, and could not do business until he would see how he was situated. He just expressed a regret that he could not attend to it, attend to the matter at that time." The witness saw Mr. Berry again in the following January, and had a very brief conversation with him on the street. He then looked thin and broken, "weak and overcome in every way. I thought he was very much repressed and broken." The witness also saw him walking down Eutaw Place: "he was then sliding and walking along in rather a sliding way, just very slowly." The witness was in a street car at the time. In the fall of eighteen hundred and ninety-eight, at the business interview above narrated, Mr. Berry "seemed excited, flushed and nervous; he then looked to me" continued the witness "like a man that was very much grieved, but usually as strong as I had seen him * * * * with the exception of this excitement he looked to me about natural." The witness was then asked whether considering all the facts he had mentioned including his long acquaintance with the deceased, he could form an opinion as to Mr. Berry's mental condition in January, eighteen hundred and ninety-nine. This was objected to, but the objection was overruled. The witness replied "Well, now, that is a pretty hard question to answer;" but finally he reached the conclusion that Mr. Berry was not then mentally fit to attend to business. Upon cross-examination he was asked in regard to the conversation of January, eighteen hun-

dred and ninety-nine. " What did he say or do that indi-
cated any depreciation of his mental capacity at that time ? "
He replied: " Nothing at all.", Question. " Nothing at all ?"
Answer. " No, sir." There was nothing wrong in the trans-
action of eighteen hundred and ninety-five. If the statement
made by the testator in eighteen hundred and ninety-eight in
reference to his financial condition was believed by him to be
true in spite of evidence which ought to have convinced him
that it was untrue, then he was laboring under a delusion ; 9
*Am. & Eng. Ency. Law*, 2 ed. 195 ; but if he did not believe
what he said to be true, then he simply uttered a falsehood.
Now, was this statement a delusion or a falsehood ? That the'
statement was false in fact is certain, but that alone is not suffi-
cient to show that he believed it to be true. In the absence
of any evidence to show whether it was a delusion it cannot
be assumed that it was ; and therefore it cannot be assumed
from its falsity alone that it furnished any indication of the
lack of mental capacity, because a falsehood uttered to get rid
of an importunate borrower, though not morally justifiable, is
certainly not evidence of insanity. The reasons given by the
witness for the opinion he expressed were too inconclusive to
warrant the expression of any opinion as to Mr. Berry's men-
tal capacity.

The *thirteenth* and *fourteenth* exceptions cover the testimony
of Doctor John C. Harris. Whilst the facts he narrates are
very slender they perhaps would warrant a physician in form-
ing an opinion and we do not, therefore, disturb the rulings set
out in these exceptions.

The *fifteenth* exception relates to the testimony of Alban G.
Stabler. . This witness testified to no business transactions and
was unable to give a single fact upon which he based his opin-
ion save as will be presently stated. The opinion which he
did give was founded exclusively upon conversations ; and the
sum of his testimony was that Mr. Berry was physically
weaker and very much more forgetful than he had formerly
been. But if physical weakness and forgetfulness of names
and recent events whilst vividly recollecting earlier occurrences,

indicate such a loss of intellectual faculties as to unfit a man to make a valid will, it may become useless for any aged person to attempt a disposition of his property in that way. There was no proper foundation for the witness to give an opinion.

The *sixteenth* exception was taken to the ruling which refused to strike out an answer of J. Summerfield Bull and the *seventeenth* and *eighteenth* were taken to the admissibility of questions propounded to the same witness. The answer given in the *sixteenth* exception should have been stricken out. It was not the statement of a fact. The witness had testified as to what he knew of Mr. Berry's appearance in January, eighteen hundred and ninety-eight, when the witness called on him, as will be noted later on, and then deposed that Mr. Berry "did not seem to want to talk ; he did not want to say anything at all." Mr. Bull was then asked: "Did he tell you why he didn't want to talk ; was there anything said about that?" Answer: "No, he didn't say anything." Question : "Sir?" Answer : "He didn't say anything. I said to him I was very sorry to see him feeling so badly, to look so bad, and I bade him good-bye and left ; he didn't look like he was—I don't know that he knew anything ; he didn't seem to know anything at all." A motion was made to strike this last answer out. The motion was overruled, but should have prevailed. The witness stated no fact and the answer was not responsive to the question. The statement that the witness did not know that Mr. Berry knew anything, was not the statement of a fact in relation to Mr. Berry's mental condition, but a statement of the witness' own want of knowledge as to that condition. The witness having confessed his own want of knowledge had no right to say that Mr. Berry *seemed* to know nothing—that was merely the impression of the witness and should not have been allowed to go to the jury. All the facts which constituted a foundation for the opinion which Mr. Bull gave in the *seventeenth* and *eighteenth* exceptions are these: That Mr. Berry had been a large man physically ; that some years ago the witness had seen him and conversed with him fre-

quently; that after Mrs. Berry's death he had fallen away, his coat was loose, his collar was too large and his face had gone in; and in January, eighteen hundred and ninety-eight, when Mr. Bull called on him, he did not want to talk.

These are the circumstances, taken in conjunction with Mr. Bull's former acquaintance and transactions with him, upon which the witness undertook to found an opinion. These were obviously inadequate to enable him to say that Mr. Berry was mentally incompetent to make a deed or contract.

The *thirty-fifth, thirty-sixth, thirty-seventh* and *thirty-eighth* exceptions are the remaining ones relating to non-expert testimony and include the testimony of Frederick A. Cochran. This witness was a cousin of Mr. Berry and lived in Virginia. He had borrowed six hundred dollars from Mr. Berry some ten or twelve years ago, and had repaid it before Mr. Berry died. Mr. Cochran knew Mr. Berry quite well and observed a change in his physical appearance after the death of his wife. In November, eighteen hundred and ninety-eight, the witness and his wife called to see Mr. Berry. The interview lasted about five minutes. Upon Mr. Cochran's entering the room where Mr. Berry was sitting, the latter began to weep as soon as he saw his visitors and seemed to be in distress and to be nervous and was very much changed. "We had but a short conversation; he asked about Aunt Ann (the mother of the witness) and said he never expected to see her again." The contrast between Mr. Berry's former physical condition and his appearance as seen during this five-minute interview is the chief and controlling fact on which the witness undertook to base an opinion as to Mr. Berry's mental capacity. There can be no doubt that the man had undergone a great physical change. He was sadly distressed at the death of his wife and he deeply mourned her loss. This grief overwhelmed him and robbed him of his former buoyancy. He was in all these respects certainly a changed man. But physical change and grief and subdued spirits may all exist consistently with an unimpaired and vigorous intellect. Is is apparent those things furnished no ground for allowing the witness to give an opinion as to Mr. Berry's mental faculties.

This disposes of all the questions which relate to the admissibility of evidence, and we are now brought to the exceptions which concern the rulings on the prayers.

After the plaintiffs had closed their case, the defendant presented two prayers ; one asking the Court to instruct the jury that the verdict must be for the defendant on the *fourth* issue, because no evidence legally sufficient to prove undue influence had been adduced ; and the other asking the Court to instruct the jury that the verdict must be for the defendant on the *fifth* issue, because no evidence legally sufficient to prove that the will had been procured by fraud, had been presented.   After these prayers were offered the plaintiff's counsel filed an order with the clerk dismissing these two issues—the *fourth* and *fifth*—and the Court allowed that order of dismissal to be filed, though the defendant's counsel objected, and allowing the issues named to be dismissed the Court declined to consider the prayers just alluded to.   This ruling is contained in the *thirty-ninth* bill of exceptions.   There was error in this ruling.   The six issues had been sent by the Orphans' Court to the Superior Court for *trial*—that is for the trial of *all* of them and not for the trial of *some* of them.   When the evidence of the plaintiffs was all in the defendant had a *right* to ask the Court to rule that there was no evidence legally sufficient to maintain the plaintiff's case, or to support any *part* of the case ; and that right could only be defeated by the plaintiffs abandoning the *whole* case, that is to say, *all* the issues.   When a question has been put in issue and an opportunity given for a fair trial of it, there ought to be an end of litigation upon it.   But if many issues are sent by an Orphans' Court to a Court of law for trial, and if after the trial has commenced the plaintiff is at liberty to dismiss some so that after being dismissed they may be subsequently renewed should the findings on those that remain be against the caveators, litigation over a will might be prolonged and protracted to such an extent as to consume a large part of the estate and greatly to delay its final settlement.   This is not the purpose which the law has in view when permitting issues to be sent to a jury for

*trial.* The right of a plaintiff to discontinue a case after it has been instituted is not absolute. *Riley* v. *First Nat. Bk.*, *Grafton*, 81 Md. 14. "We don't intend, however," observed this Court in *Price* v. *Taylor*, 21 Md. 365, "to say that parties plaintiff could always have the right to dismiss issues without trial." In *Pegg et al.* v. *Warford*, 4 Md. 385, it was held that the Orphans' Court had no power to revoke an issue which had been sent to the Superior Court for trial, but "that by *consent* of the parties to the proceeding," the issues may "be abandoned in the Court of law where they are pending for trial," and others may be framed by the Orphans' Court. If it be true that the right to dismiss a case is not unrestricted; and if it be true that it requires the "consent of the parties to the proceeding before issues can be abandoned in the Court of law, then there can be no absolute right to dismiss a part of the case or some of the issues after the trial of the whole of the questions involved has commenced. A trial is commenced when the jury has been sworn. *Price* v. *State*, 8 Gill, 295. It would be subversive of sound policy in the administration of justice if after issues have been framed to determine every question affecting the validity of the instrument, and if after the jury had been sworn upon those issues, the plaintiff were at liberty when defeated on part of those issues to dismiss them without allowing the defendant to have a binding verdict in his favor on them. And this would be so because the defendant is entitled to have the unsustained grounds of attack effectually and finally disposed of so that they may not be reopened again. There was not a particle of evidence produced to show that the will had been procured by fraud or by undue influence and the prayers so instructing the jury should have been granted notwithstanding the order filed directing a dismissal of the *fourth* and *fifth* issues. And this is also true of the *third* and *sixth* issues which the plaintiffs attempted to dismiss after the jury had been sworn. So long as *any* of the issues remain for trial *all* of them remain, and none of them can be dismissed after the trial has commenced. If no evidence be offered to sustain some of them, then the defendant is en-

titled to an instruction to that effect and he is entitled to a
verdict in his favor to that extent.   The issues having been
made up by the Orphans' Court and having been sent to a
Court of law for trial, neither side to the contest has control of
them, and unless they are disposed of by *consent* or are *all*
dismissed they must be tried ; and part of them cannot be
withdrawn by either contestant.   The rulings in both the
*thirty-ninth* and *first* exceptions must consequently be re-
versed.

We have now to consider the prayers contained in the *for-
tieth* bill of exceptions.   The plaintiffs presented *twenty-two*
and the defendant *seven*.   The Court granted the plaintiff's
*fifth*, *sixth*, *seventh*, *eighth*, *eleventh*, *seventeenth*, *eighteenth*,
*nineteenth* and *twenty-first* and refused the other *thirteen*, and
granted the defendant's *first*, *second*, *fourth* and *seventh*, but
rejected its *fifth* and *sixth*, though giving one of its own in
lieu of the latter.   The defendant's *third* prayer does not
seem to have been acted on.   Most of the plaintiff's granted
prayers are not open to criticism, and we shall only notice
those that we deem erroneous.   The *eleventh* prayer was specially
excepted to on the ground that there was no evidence to show
that Mr. Berry ever had been afflicted with any mental un-
soundness of a permanent and continuing nature.   The legal
proposition embodied in the prayer is correct.   In substance
it is this : If the jury find that the testator was by reason of
mental incapacity incapable of making a valid will at any
time [prior to February the tenth, eighteen hundred and
ninety-nine, and that such unsoundness was not tran-
sitory but was of a permanent and continuous nature, then
the burden of proving that Mr. Berry was of sound mind
when the will was executed was on the defendant.   This
prayer was taken from *Etchison* v. *Etchison*, 53 Md. 353.
But the difficulty is there is no evidence to support its hy-
pothesis.   The burden of proof was shifted to the defendant
though there was no evidence tending to show that Mr. Berry
had ever been permanently insane.   The presumption of sanity
must be overcome by those who allege insanity ; but when

permanent mental incapacity has been established, the party setting up the will must show that at the time of its execution the testator was competent to make it. *Taylor* v. *Creswell, Ex.*, 45 Md. 430. Because of the lack of evidence to support the hypotheses of the prayer, it should have been rejected.

The *seventeenth* prayer was erroneous. Its vice consists in this, that it told the jury the opinions of the subscribing witnesses were of no more weight than the opinions of other witnesses of equal intelligence and equal knowledge of the matters as to which the subscribing and the non-subscribing witnesses testified. This places the testimony of these two classes of witnesses on the subject of mental capacity upon precisely the same footing as to value, provided the non-subscribing witnesses were equally as intelligent as the subscribing witnesses and possessed equal knowledge of the matters as to which each class had respectively testified. The proposition thus announced is manifestly misleading. It entirely eliminates all consideration of the *credibility* of the witnesses, and thus authorizes the jury to attach as much value to the testimony of a witness who deserves no credit as to the testimony of one thoroughly reliable, if both are, though not equally credible, equally *intelligent* and possessed of equal knowledge of the facts to which both testify. Again: It altogether loses sight of the distinction which the law makes between subscribing and non-subscribing witnesses. In the case of *Townshend v. Townshend*, 7 Gill, 27, this difference is distinctly pointed out. "It is stated," says the Court, "by the elementary writers upon this subject that the attesting witnesses are considered in the law as placed round the testator to protect him against fraud in the execution of his will, *and to judge of his capacity* * * * * and it is their duty to inform themselves of his capacity, before they attest his will, and it is on this ground that these witnesses are permitted to testify as to the opinions they formed of the testator's capacity, at the time of executing his will. And it is equally true, as a general proposition, that the mere naked

opinions of other persons not occupying the position of medical men, are inadmissible in reference to the mental capacity of a testator whose will may be controverted." To the same effect is *Williams* v. *Lee*, 47 Md. 325. The *seventeenth* prayer fails to observe this distinction and should not have been granted.

The *eighteenth* prayer ought not to have been granted, because it was misleading. Prayers calling attention to and emphasizing certain items of proof as *tending* to prove certain facts have been frequently condemned by this Court. This instruction gives prominence to the opinions of the medical experts, and whilst it does not specifically say that those opinions tend to prove incapacity, yet by directing the jury to consider them in connection with all the other evidence, the jury may well have supposed that they were required to be controlled by those opinions if they credited the facts on which the opinions purport to be founded, even though the jury might not concur in those opinions or believe them to be sound. "The Court in ruling the evidence admissible, on a general offer, allows it to be considered and weighed for all the legitimate purposes of the case ; and its force and bearing as means of proving any particular fact in contest is exclusively for the jury." *Johns* v. *Marsh*, 52 Md. 337. Besides, the opinions given by the experts and excepted to being inadmissible, the prayer could not be correct.

Because of the errors pointed out the rulings in all the bills of exception other than the rulings in the *thirteenth* and *fourteenth*, and other than some of the rulings on the prayers in the *fortieth* exception, must be reversed and a new trial must be awarded.

*Rulings reversed as above specified and new trial awarded.*

(Decided June 14th, 1901.)