INGALLS, EXECUTOR OF THE ESTATE OF JOHN LUTHER INGALLS *v.* TRUSTEES OF THE MT. OAK METHODIST CHURCH CEMETERY OF MITCHELLVILLE, MD., ET AL.

[No. 439, September Term, 1965.]

*Decided November 9, 1966.*

*Motion for rehearing filed December 6, 1966, denied December 9, 1966,*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*William Reback* for appellant.

*C. L. Fosset, Jr.,* with whom were *W. Carroll Beatty, David A. McNamee* and *Richard Bourne* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal involves the caveat to the will of John Luther Ingalls who died on October 28, 1963 at the age of 84. The will was dated November 11, 1961 and named Arthur Morton Ingalls, the nephew of the testator as executor. The will was admitted to probate by the Orphans' Court of Prince George's County and letters testamentary were granted to the named executor who duly qualified as executor. The trustees of Mt. Oak Methodist Church of Mitchellville, Maryland, the American Red Cross, and a number of individual legatees under a previous will, each of whose shares of the testator's estate had been either reduced or eliminated by the will admitted to probate, filed a caveat. After the executor had filed his answer to the caveat, seven issues were framed and sent to the Circuit Court for Prince George's County to be tried by a jury.

At the conclusion of the caveator's case, the Circuit Court (Powers and Meloy, JJ.) directed a verdict in favor of the caveatee (the executor) on each issue except the issues of undue influence (Issue No. 3) and mental capacity (Issue No. 4) and reserved its decision on those two issues. The caveatee again moved for a directed verdict in his favor at the conclusion of the trial on the remaining two issues. The Circuit Court again reserved its decision on those issues and submitted them

to the jury. The jury answered those two remaining issues in favor of the caveators, i.e., that the will admitted to probate was procured by undue influence and that the testator had lacked mental capacity at the time the will of November 11, 1961 was executed. The caveatee filed motions for judgment *non obstante veredicto* or in the alternative for a new trial. These motions were overruled by the Circuit Court, thereby allowing the jury's verdict on the two issues to stand. An appeal was timely taken to this Court by the caveatee from the order overruling his motions.

Three questions are presented to us by this appeal. They are:

1. Did the trial court err in allowing Jesse Lee Hall, a lay witness, to testify in regard to his opinion that the testator was mentally incompetent on the day the will was executed?

2. Should the trial court have directed a verdict for the caveatee at the close of all the testimony on the issue of mental incapacity of the testator at the time of the execution of the will?

3. Should the trial court have directed a verdict for the caveatee at the close of all the testimony on the issue of undue influence?

The Court has concluded that all of these questions must be answered in the affirmative and the order of the trial court must be reversed.

In considering the facts, all conflicts in the evidence must be resolved in favor of the caveators and the Court must assume the truth of the evidence produced on their behalf as well as all reasonable inferences in favor of the caveators that may be drawn from the evidence. *Tufts v. Poore,* 219 Md. 1, 8, 147 A. 2d 717, 721 (1959). See also *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A. 2d 53, 55 (1961).

Many of the facts are not in dispute, and are as follows: The testator was born on December 10, 1878 in Arkansas. His family moved to Maryland where he established a business selling farm implements and machinery, in partnership with Lyle L. Simmons. Their place of business was a store on Route 301 at Mitchellville, Prince George's County.

The testator was a bachelor. In 1957 he had two living

brothers, Walter and James, a number of nieces and nephews, and several grandnieces and nephews. For many years he had been an active member of Mt. Oak Methodist Church, Mitchellville, being a member of both the official board and one of the trustees of that church. In 1957 or 1958 when that church had a reception for its oldest members, the testator was the oldest of the five or six persons honored on that occasion and was at that time made an honorary member for life of the official board and an honorary trustee.

Jesse Lee Hall, a member of the Maryland and District of Columbia bars, began to represent the testator sometime between 1935 and 1940. He advised him in regard to his income tax returns, his delinquent customers and various landlord-tenant matters.

When Mr. Simmons died in April 1957, the testator, who had bequeathed certain things to his deceased partner, called upon Mr. Hall to make a new will for him. This apparently was the will of April 11, 1957. In this will, the testator, after providing for a suitable marker for his grave and a bequest to the trustees of Mt. Oak Methodist Church of $5000 to provide for the perpetual upkeep of the testator's family lot in Mt. Oak Cemetery, provided for a number of bequests to his nieces, nephews, grandnephews, his two brothers and to various friends and employees. In Item Twenty-first,—the residuary clause—the testator provided that after the payment of the costs of administration, taxes and the legacies, the residue should be divided equally between the trustees of Mt. Oak Methodist Church and the National (sic) Red Cross, Washington, D. C. Jesse Lee Hall and LeRoy Hall were named executors and were directed to sell all real estate not specifically devised. If either of the Halls predeceased the testator, Reeves Blandford was named as executor in the place of the person predeceasing the testator.

The testator executed another will on October 25, 1958. In this will he continued many of the legacies in his 1957 will, added new legacies and reduced the amounts of various legacies. There was also a provision for abatement of legacies if the estate was not of sufficient size to pay all legacies, with the provision, however, that the legacies which should pass to the chil-

dren of his brothers Walter and James or their children in Items Third and Fourth should abate first, proportionately, and thereafter all remaining legacies should abate proportionately including the legacies to Walter and James in Items Third and Fourth. The residuary clause—Item Nineteenth—was identical with that in the 1957 will.

The testator executed three codicils to the 1958 will. They were dated January 7, 1959, August 4, 1959 and May 21, 1960, respectively. The last codicil to the 1958 will recited the testator's agreement with Arthur Morton Ingalls and his wife (hereinafter mentioned) and a conveyance to them of 2 acres of land out of the testator's farm at Mitchellville, for which reasons he revoked the specific legacy of $5000 to Arthur Morton Ingalls (but not the $1000 legacy to Arthur's daughter, Janie).

On November 11, 1961, the testator executed the will which is the subject of the caveat in the case at bar.

In comparing the 1958 will and three codicils to that will with the challenged 1961 will, the 1958 will and codicils had 41 legatees whereas the 1961 will had 34 legatees. Seventeen of the named legatees in the 1958 will and three codicils do not appear in the 1961 will, but 10 old friends of the testator who were not named in the 1958 will and three codicils are named in the 1961 will. It is significant to note that every member of the family of the testator received legacies in the 1961 will except the two grandnieces. One of these resided in Maine and the other was Janie, the daughter of Arthur and Jane who received a legacy in the 1958 will but not in the 1961 will.

The will of November 11, 1961 was duly signed and sealed by the testator, who signed his full name "John Luther Ingalls" at the end of the will and on the margin of each page. It was witnessed by three witnesses — Marie Bealle, Ray S. Bealle (both having the address 5130 4th St., N. E., Washington, D. C.) and John B. Casey (having the address 213 C St., N. W., Washington, D. C.).

As referred to in the Third Codicil of May 21, 1960, the testator had made an agreement with his nephew Arthur and his nephew's wife, Jane, whereby the testator would use the sum of $13,500 to build a new house on his South River Park property at Edgewater, Anne Arundel County and convey the prop-

erty to Arthur and Jane, subject to a life estate and lien for the performance of the agreement of Arthur and Jane to move into the new home and to look after his needs and comforts for the remainder of the testator's life. Mr. Hall described his instructions from the testator in regard to the transaction as follows: "The instructions were given to me by Mr. Ingalls, in the presence of Mr. Morty Ingalls [Arthur M. Ingalls] and his wife." Arthur made the appointment to come to Mr. Hall's home and "after a thorough discussion, according to the agreement of both parties," Mr. Hall prepared the deed. When asked what was the purpose of the deed, Mr. Hall testified:

"It was the purpose that Morty and his wife, if Mr. Ingalls would convey the property to them at South River Beach and put a new home on it, that they would take him there and would take care of him and maintain and support him for the rest of his natural life, and take care of his medical expenses and all other needs which became necessary from time to time."

At this time the testator was 82 years of age. The testator, at the conference stated: "Jesse, I would like to talk to you personally." After this statement Mr. Hall requested Arthur and his wife to go into another room or the side porch while he talked privately with the testator and after they went out, the following occurred:

"* * * Mr. Ingalls asked that I draw some agreement, but not to deed the property then because he was afraid he wouldn't have the security which he desired. And it was then that I told him that I would make it just as tight as I possibly could legally, that he would be protected, and I suggested to him that I would draw a deed for the property and reserve unto him a life estate, and also a lien to secure the performance of their obligation to support him the rest of his days. And I drew that deed and I spelled it out in the deed."

The deed prepared by Mr. Hall for the testator, dated and executed by the testator on June 14, 1960, recited:

"* * * that for and in consideration of this conveyance, and the payment of the sum of $13,500.00 by the party of the first part, to the parties of the second part, receipt whereof is hereby acknowledged, the parties of the second part agree and bind themselves jointly and severally to forthwith construct a new dwelling on the property hereby conveyed, to support the party of the first part and furnish him with a home with them, and when the said new dwelling has been completed, the party of the first part is to live therein with them and they are to furnish him with suitable food and clothing, and medical attention, and all other necessities, for the remainder of his natural life; and a lien is hereby specifically retained on the property hereby conveyed to secure the performance by the parties of the second part of all of said obligations heretofore set forth.

"For the consideration aforesaid, the party of the first part does grant and convey unto the parties of the second part as tenants by the entireties, their, his, or her heirs and assigns, in fee simple, reserving, however, a life estate unto the said grantor, * * *."

The South River Park property is then described and was conveyed to Arthur and Jane, as tenants by the entireties in fee simple, "subject, however, to the lien and life estate heretofore reserved."

Also on the same day, June 14, 1960, Arthur and Jane reconveyed to the testator 2.19 acres of land which they had obtained from the testator by a deed dated March 2, 1959.

At the time of making the agreement mentioned in the Third Codicil of May 21, 1960 and in the deed of June 14, 1960 from the testator to Arthur and his wife of the remainder in the South River Park property, subject to the lien, Arthur was earning $85.00 a week.

In the spring of 1960, the testator moved in with Arthur and Jane in their apartment in Washington, D. C. pending the erection of the new home on the South River Park property. After the new home was completed, the testator, Arthur and Jane in

July 1960 moved into it where the testator continued to reside until the last part of his terminal illness.

In August 1961, according to Jane's testimony, the testator requested Arthur and Jane to obtain an attorney to draw an instrument which would give Jane a power of attorney to act for the testator. Jane called the Court House in Annapolis to obtain the name of an attorney and was referred to William W. Townsend, a member of the Maryland Bar who practices in Annapolis. Mr. Townsend was subpoenaed to testify in the case and testified that on August 23, 1961 Jane and the testator came to his office to have a power of attorney drawn. Mr. Townsend had not seen either Jane or the testator before. He had a conversation with the testator which he described as follows:

> "He asked me for a power of attorney, and if I recall correctly, I explained to him the difference between a special power of attorney, as I refer to it, or for a general power of attorney, and after I explained the difference Mr. Ingalls said that he would prefer the general power of attorney."

Mr. Townsend also stated that in preparing a power of attorney for elderly people his office took more precautions than it did usually with other documents. When asked whether he noticed anything unusual about the testator's conduct he replied: "No. He was quite an elderly man. He was a small man, but I didn't see anything out of the ordinary as far as I was concerned."

Jane used this general power of attorney only twice: (1) in May or June, 1963 when she borrowed $1000 from the Maryland National Bank in order to pay the testator's taxes, and (2) in September 1963 when she borrowed $1000 from the same bank to pay the medical bills of the testator.

Other facts will be stated in the discussion under the three questions presented to us for decision.

## (1)

We have concluded that the trial court erred in allowing Mr. Hall, as a lay witness, to testify in regard to his opinion that the testator was mentally incapable on November 11, 1961, the date when the testator's last will was executed.

Mr. Hall represented the testator for a number of years, beginning sometime between 1935 and 1940. He prepared the 1957 and 1958 wills as well as the three codicils to the 1958 will. He represented the testator in a dispute with the widow of Mr. Simmons, the deceased partner and closed this matter out in 1958 or 1959. He was counsel for the testator in connection with the agreement between the testator and Arthur and Jane and the deeds of June 14, 1960. It is clear that the testator in June 1960 was capable of executing a valid deed or contract and that Mr. Hall recognized this.

After June 14, 1960, Mr. Hall saw the testator only one time in the year 1960 around Christmas of that year when he attended a Christmas party given for the testator at his shop or store on Route 301 at Mitchellville. At that time Mr. Hall stated that he said to the testator:

> " 'Mr. Ingalls this is Jesse. Don't you know me?' And he said, 'Well, I ought to know you.' And I tried to tell him who I was and what I did for him, this, that and the other, but he would just shake his head, 'Uh-huh, uh-huh.' Then I have had him come right back a few minutes time and say, 'Who did you say you were?' And I would tell him again * * *."

Mr. Hall saw the testator twice in 1961—once in the spring of 1961 (prior to April 15, 1961) and the other time in June or July 1961. On the first visit Mr. Hall, who had prepared the decedent's income tax returns for 1960, discussed the returns with the testator at the testator's home. His account of this meeting was as follows:

> "Well, I tried to—I went over his income tax return with him, and sat close to him because he was beginning to be hard of hearing. And I was talking to him and I noticed that his lower jaw had dropped down and he was looking off into space. And I said, 'Mr. Ingalls, do you understand what I am saying?' He said, 'Huh?' I said, 'Well, do you know what I am saying?' 'I guess so.'
>
> "And finally after spending about half an hour with him going over these things with him and with no re-

sponse or questions from him—Mrs. Ingalls, she was present, she said, 'Mr. Hall, don't bother him anymore. Leave it to me. I will see he signs the papers and send them off.'

"Q. Did you get them back signed or sent off? A. I made arrangements she would see they were signed and she would send them on to Baltimore."

On the second and last conference Mr. Hall had with the testator, in June or July 1961, Mr. Hall stated what happened as follows:

"* * * I was asking him about the crops on the farm, and he wanted to know what farm.

"I said, 'Mr. Ingalls, you only have one farm that I know of, up at Mitchellville. I said, 'How are your crops up there?' 'I don't know.'

"And then I asked him about the different people up there. And he said, 'I don't know.' And I would try to hit up on some other conversation. * * *

"I started down the steps and he started following me.

"And Mrs. B. Jane Ingalls said, 'John, you come back here. Don't you go down those steps. You will fall down.' He said, 'No; I want to talk to Jesse.' So, I told her, 'Don't worry about it. I'll see he won't fall.'

"And I went down the steps with him, and I stood down there and talked to him. And he said, 'Something I want to say to you, Jesse', he said, 'but it's gone from me.' He said, 'My head is just as cold.' And I suggested that he wear a stocking cap like these toboggan caps.

"And about this time one of his tenants came up. Freddie Powell, with a list of his sales of tobacco down at the market, and Freddie Powell and I talked to him. I took the sales and went over the sales slips with him to show him the prices for his tobacco. And he would say 'Uh-huh, uh-huh.' And he said, 'Do I get any money?' And I said, 'Well, here is a check here stapled right to it.'

"And then I was talking, he says, 'Where is my farm?' And I told him again where his farm was. * * *

"And he asked me again who I was. Freddie Powell came up. He didn't know Freddie Powell. 'How are you, Mr. Ingalls?' He said, 'How'd you do.'

"Q. Who is Freddie Powell? A. One of his colored tenants up there.

"Q. Has he worked with Mr. Ingalls a long time? A. He has been with Mr. Ingalls, oh, I imagine—I think he has been working his farm ever since I have been handling Mr. Ingalls' affairs. He worked his farm about 16 years. I think I have known Freddie Powell, and Mr. Ingalls has known him, for probably 30, 37, 35 years, long time.

"And I told him, I said, 'This is Freddie Powell.' He says, 'Uh-huh.' He said, 'I ought to know you.' And we were talking, I was going over the crops with him, and he would look at Freddie Powell again and say, 'Who did you say you are?' He said, 'I'm Freddie. I work your tobacco up there. Don't you know who I am?' 'I ought to know you.'

"So, finally I said, 'Mr. Ingalls, what is it you want? Is there something you want to tell me?' He said, 'Jesse, I want to tell you something but I can't.' He said, 'I can't think of it. I don't know what it is.' He says, 'Every time I try to think my mind goes blank on me.'

"So, I left him. I left him and Freddie there, and that is the last time I saw him."

Mr. Hall was then asked the following question: "In your opinion was John Luther Ingalls competent to make a valid deed or will on November 11, 1961?" Counsel for the caveatee duly objected, and after a conference at the bench, the trial court permitted Mr. Hall to answer the question. The answer was: "In my opinion, definitely not."

On cross-examination, Mr. Hall stated in reference to the testator: "I think he had flashes of lucidity." Later when interrogated concerning the last meeting with the testator in June or July 1961, Mr. Hall stated, after recalling that the testator

had said "Do I get any money?" in reply to a question as to whether that was a rational thing for a man to say, "I think so. It would be for me," and later referred to that statement as —"That is a flash of lucidity, because he was concerned about money."

Mr. Hall also stated when he testified that Jane approached him about the testator's desire to leave her $5000.

> "Well, Mrs. Ingalls, I have some doubt in my mind as to his condition. * * * Well, now, listen, I don't believe the man is competent to make a will, but if you take him to a good physician or psychiatrist, and if they say he is of sound mind, you get in touch with me, bring him to me, or I will come down, whatever you want to do, and I will make a will if Mr. Ingalls tells me to."

Quite apart from Mr. Hall's testimony on cross-examination, it seems clear to us that his testimony on direct examination, taken in the light most favorable to the caveators, gives only facts indicating that the testator who was then over 80 years of age, was at times not competent to execute a valid deed or contract, but at times was lucid and competent to execute a valid deed or contract. Not having seen the testator subsequent to June or July 1961, or approximately four months prior to execution of the last will on November 11, 1961, we are of the opinion that Mr. Hall had not stated facts sufficient to justify his expression of a lay opinion that on the day the will was executed, the testator was not capable of executing a valid deed, contract or will.

In Maryland, the legal standard which the trier of fact is to apply to the evidence in determining the mental capacity of the testator to make a valid will, is stated in the Code (1957), Art. 93, § 349 as follows:

> "No will, testament, or codicil shall be good and effectual for any purpose whatsoever unless the person making the same be at the time of executing or acknowledging it as hereafter directed, of sound and disposing mind, and *capable of executing a valid deed or contract.*" (Emphasis supplied).

Issue No. 4 in the case at bar is properly drawn in the very words of this statutory provision.

It is the established practice in Maryland to permit a lay witness to give an opinion in regard to the mental capacity of a testator, even though that opinion amounts to a conclusion on the very legal issue upon which the trial court must instruct the jury. *Jones v. Collins,* 94 Md. 403, 51 Atl. 398 (1902) ; *Baugher v. Gesell,* 103 Md. 450, 63 Atl. 1078 (1906) ; *Kelly v. Kelly,* 103 Md. 548, 63 Atl. 1082 (1906) ; *Hamilton v. Hamilton,* 131 Md. 508, 102 Atl. 761 (1917) ; *Plummer v. Livesay,* 185 Md. 450, 44 A. 2d 919 (1945) ; *West v. Fidelity-Baltimore Nat. Bank,* 219 Md. 258, 147 A. 2d 859 (1949). Notwithstanding that the majority of jurisdictions other than Maryland would refuse to permit a witness to answer such a question, and Professor McCormick,[1] indicates that he thinks the majority rule is to be preferred, the Maryland practice is too well established by our prior decisions to be departed from now and we adhere to our prior decisions in this regard.

The Maryland rule in regard to the admissibility of opinion testimony by lay witnesses in cases involving challenges to wills because of alleged mental incapacity is subject, however, to a most important and well-established qualification, i.e., that the lay witness must precede his opinion by disclosing his means of knowledge as to the mental condition of the testator and his reasons for the conclusion stated. The Maryland rule was stated

---

1. See McCormick, Handbook of the Law of Evidence at pages 27-28. See also Wigmore, Evidence, Sec. 1958 and cases cited therein. In Grismore v. Consolidated Products, 232 Ia. 328, 5 N. W. 2d 646, 663 (1942), the Supreme Court of Iowa gives the following basis for the majority rule: "No witness should be permitted to give his opinion directly that a person is guilty or innocent, or is criminally responsible or irresponsible, or that a person was negligent or not negligent, or that he had capacity to execute a will, or deed, or like instrument * * *. But the reason is not that such matters are not subjects of opinion testimony. They are mixed questions of law and fact. When a standard, or a measure, or a capacity has been fixed by law, no witness whether expert or non-expert, nor however qualified, is permitted to express an opinion as to whether or not the person or conduct, in question, measures up to that standard. On that question the court must instruct the jury as to the law, and the jury must draw its own conclusion from the evidence."

by Judge Delaplaine, for the Court, in *Doyle v. Rody,* 180 Md. 471, 481, 25 A. 2d 457, 462 (1942), as follows:

> "But a non-expert witness is qualified to express an opinion as to a testator's mental capacity only where the acts and circumstances, of which the witness had personal knowledge, are sufficient to form a basis for the formation of rational opinion. He must state the facts as far as he can and disclose what led to his conclusion. If the whole testimony of the witness fails to show facts sufficient to justify the conclusion reached by him, he should not be permitted to express an opinion."

See also *Johnson v. Schmidt,* 158 Md. 555, 566-67, 149 Atl. 283 (1930); *Plummer v. Livesay,* 185 Md. at 456-57, 44 A. 2d at 921; *Smith v. Biggs,* 171 Md. 528, 534-35, 189 Atl. 256 (1932); *Sellers v. Qualls,* 206 Md. 58, 67, 110 A. 2d 73, 77 (1954); and *West v. Fidelity-Baltimore Nat. Bank,* 219 Md. at 264, 147 A. 2d at 862.

This rule was apparently first applied by our predecessors in 1848 in *Townshend v. Townshend,* 7 Gill 10. See also Annot. *Requisite foundation to predicate or permit nonexpert witness to give opinion, in a civil action, as to sanity, mental competency, or mental condition,* 40 A. L. R. 2d 15, 78-81, for other Maryland cases.

Professor Wigmore [2] is critical of the Maryland rule but we

---

2. See Wigmore, Evidence, Secs. 1922, 1935. Professor Wigmore's principal objection is that in his opinion this rule distorts the normal test by which a witness is competent to testify: if he had an opportunity to observe and did observe "thereupon it is proper for him to state his conclusions, leaving the detailed grounds to be drawn out on cross-examination." The Maryland Rule changes this normal procedure where testamentary capacity is the issue involved. However, in view of the Maryland policy of allowing a lay witness to state, in effect, his "legal conclusions," the Maryland rule of requiring that a sufficient foundation be given *prior* to the expression of such an opinion, is a wise policy holding such a witness to a high standard of competency. See Brashears v. Orme, 93 Md. 442, 448, 49 Atl. 620, 622 (1901) in which Judge Boyd, for the Court, stated: "Although opinions of witnesses who are not ex-

will not depart from a rule which has been followed in this State for such a long period and established by such a long line of consistent prior decisions of this Court. We might add that whatever logical imperfections may exist in the two Maryland rules already discussed, when taken together they present a just and practical way of dealing with a most difficult problem and in our opinion carry out a sound public policy.

Mr. Hall's testimony was, in our opinion, even less sufficient to lay a proper foundation for his opinion relating to the testator's mental incapacity to execute a will than was the testimony of lay witnesses involved in several of our prior decisions in which we held that no proper foundation for the lay opinion had been established. See *Giardina v. Wannen*, 228 Md. 116, 122-23, 179 A. 2d 357, 361 (1952); *Arbogast v. Mac-Millan*, 221 Md. 516, 522, 158 A. 2d 97, 101-02 (1960); *West v. Fidelity-Baltimore Nat. Bank, supra; Sellers v. Qualls, supra;* and *Safe-Deposit & Trust Co. of Baltimore v. Berry*, 93 Md. 560, 49 Atl. 401 (1901). The caveatee's objection to the question [3] in regard to Mr. Hall's opinion in regard to the mental incapacity of the testator should have been sustained.

---

perts are admissible under proper circumstances, it is a character of evidence that should be very carefully guarded and is liable to do great harm unless it is. A question calling for an opinion of that nature should be so framed that there can be no doubt as to the time it refers to and if it is not it should not be permitted to be propounded. * * * Jurors are sometimes greatly influenced by the opinions of witnesses they happen to know, and in whose judgment they have confidence, and such an opinion should not be based on insufficient evidence." See also MacAfee v. Higgins, 31 D. C. App. 355 (1908) to the same effect.

3. It may be observed that the *form* of the question presented was not technically correct as it asked for Mr. Hall's opinion of whether on November 11, 1961 the testator was "competent to make a valid deed *or will*" (emphasis supplied). The statutory formula is whether or not the testator is "capable of executing a valid deed *or contract.*" (Emphasis supplied). As the validity of *the will* is the ultimate legal conclusion in the case, the use of the words "or will" rather compounds, as it were, Professor Wigmore's objection to the Maryland rule. The distinction between the capacity necessary to execute a valid deed or contract and that needed to execute a valid will is too subtle in these circumstances to justify a holding of error on this technical ground alone. As Mr. Justice Woodward

(2)

The trial court, in our opinion, should have directed the jury to answer Issue No. 4 in regard to mental incapacity "Yes," in accordance with the motion of the caveatee, as there was no legally sufficient evidence of mental incapacity to submit to the jury on this issue.

The applicable law was well stated by Judge Horney, for the Court, in *Arbogast v. MacMillan*, 221 Md. at 523, 158 A. 2d at 101, as follows:

> "The law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble*, 156 Md. 489, 494, 144 Atl. 698, 700 (1929); *Smith v. Shuppner*, 125 Md. 409, 417, 93 Atl. 514, 517 (1915). Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker*, 172 Md. 477, 192 Atl. 327 (1937); *Gesell v. Baugher*, 100 Md. 677, 60 Atl. 481 (1905)."

The only medical testimony in the case in regard to the testator's mental capacity to execute his last will on November 11, 1961 was that of Dr. Samuel M. Bageant. Dr. Bageant, a graduate of Georgetown Medical School and duly licensed to practice medicine in Maryland and in the District of Columbia,[4] had treated the testator on July 26 and July 30, 1960 prior to his examination of the testator on September 16, 1961. On

---

for the Supreme Court of Pennsylvania stated in 1861 in Daniel v. Daniel, 39 Pa. 191, 212: "If microscopic vision could detect a distinction, who has scales nice enough to tell how much it would weigh in the jury box?"

4. Dr. Bageant is connected with the District of Columbia Medical Society, the American Medical Association and the Eastern Psychoanalytic Association. He is connected with the Washington Hospital Center, Suburban Hospital and Washington Sanitarium. At the time of trial he had been the physican for the Eastern Star Home, a home for elderly people most of whom were retired.

this last mentioned date, Dr. Bageant, after examining the testator, gave a written certificate that he found the testator to be mentally competent. He examined the testator again on December 2, 1961 and gave a certificate that the testator was "mentally competent evidenced by being in touch with reality and able to recall his heirs and financial state." The testator had arteriosclerosis when he treated him in 1960 and complained of some dizziness at that time. Dr. Bageant testified that most people over 40 years of age have some degree of arteriosclerosis. He testified that the disease is gradual and is a progressive deteriorating disease; that a person may have the disease and still be competent and that during certain stages of the disease a person will have better days and worse days. In his professional opinion the testator was mentally competent to make a will on November 11, 1961.

There were three subscribing witnesses to the last will, one of them died prior to the trial of the caveat case. The surviving two subscribing witnesses both testified that in their opinion the testator was mentally capable of making the will. One of the subscribing witnesses was John B. Casey, a member of the bar and a partner of William Reback who prepared the last will for the testator. Mr. Casey testified that the testator verbally declared the will to be his last will and testament stating in response to a question by Mr. Reback "Yes, this is my last will." He testified that the office practice was to read wills to testators and, although he was not present, he assumed that Mr. Reback had followed this practice as he had asked every one other than the testator, to leave the room. Jane, who, with her husband, Arthur, accompanied the testator to Mr. Reback's office, testified that on November 11, 1961, the testator shook hands with the people at the office, had a conversation with them; that his speech was coherent and that, in her opinion, he was competent on November 11, 1961. Arthur gave similar testimony. Mrs. Walter L. Ingalls, the sister-in-law of the testator and who had known him between forty-five and fifty years, also saw the testator the morning of November 11 at her apartment. She said he was "kind of spruced up" and she said to him, "My, but you do look nice. You look like you have a date, and the testator replied "No, I am going down to

the lawyer's office to sign up my will." She was of the opinion that the testator was competent prior to and on November 11, 1961.

Against this somewhat formidable proof of capacity to execute the will on November 11, 1961, the caveators, in addition to Mr. Hall's testimony to which we have already referred in some detail, offered the following evidence: Reeves Blandford, branch cashier of the Maryland National Bank at Upper Marlboro indicated that in the latter part of the testator's life he became "quiet and reserved" and had little conversation beyond asking Mr. Blandford "How is your family." At one time Mr. Blandford questioned whether to permit the testator to make a larger mortgage to the bank and took the matter up with the Board and the bank's attorney, but there was no showing that the bank refused to make the additional loan and Mr. Blandford was not asked to express an opinion concerning the testator's capacity to make a will on November 11, 1961.

Jacqueline Garner Smith, a registered nurse and employed as a public health nurse in Prince George's County, had known the testator since 1935. She visited him at his new home at Edgewater the latter part of the summer of 1961. At that time the testator was thin and did not "remember anybody" and "didn't know us." She admitted on cross-examination that the testator was at home alone with a little dog, which kept barking when the witness was at the door and finally the testator (who had become somewhat deaf) answered the door. The witness stated that she did not know the testator's condition either a month before or a month after her visit at the end of the summer of 1961. She was not asked to express an opinion in regard to the testator's mental capacity on November 11, 1961.

Frank Furr, who had known the testator for seventeen years as a friend and employee, testified that he had seen the testator two or three times in 1960 and also in 1961. On one occasion in 1960 he noticed that the testator went back and forth to the mail box at least four or five times during the same morning. The testator would stare at Mr. Furr who asked him "Don't you remember me? I work on your place?" and the testator would answer "Yes." In 1960 the testator had stated to the witness that "they had stole his car" but the witness did

not know what the testator meant by that. Mr. Furr was not asked his opinion as to the testator's mental capacity to execute a valid deed or contract on November 11, 1961.

Frederick Powell had known the testator for approximately 35 years and had worked for him the last 16 years of the testator's life. In 1960 or 1961, Mr. Powell had a discussion with the testator about his tobacco crop. The testator wanted to know "what tobacco" and when it was explained by the witness that the tobacco was raised on the testator's farm, the testator replied "Oh, yes, yes," Mr. Powell also testified that the testator had told him "They stole my car" but did not say who "they" were. Mr. Powell was not asked to express an opinion in regard to the testator's mental capacity.

Ethel May Garner Elledge, although not related to the testator by blood or marriage, had visited the testator with her parents and for two summers, the witness and her husband lived at the testator's home in South River Park. She saw the testator around Christmas 1960 and noticed that the testator kept repeating things and had difficulty in remembering things. She was not asked for her opinion as to his mental capacity.

Vernon Henry Wilson, who was a friend of the testator and who had known him for thirty years (the testator had lived at his house from 1939 to 1945) was present when the testator's car was traded in 1961. The testator asked the witness where he lived and the witness said "Mr. Ingalls, I live over there, the same place you lived with me." The testator did not have much to say and seemed "very vague." The witness was not asked for any opinion as to the testator's mental capacity.

Octavia Proctor had known the testator for almost 30 years and had been his employee as had her husband, Sandy. She and her husband saw the testator in the spring of 1961 at his home. The testator did not pay any attention to Sandy but came over to the witness and in a low tone of voice talked to her about how he and his family used to cut wood in Maine and how his father used to make coats. The witness was asked no question in regard to the testator's mental capacity.

Edna Wilson, the great niece of the testator, had known the testator all of her life. The testator had lived with the witness and her husband for over five years. At "watermelon time" in

1961 she saw the testator in the automobile of Arthur and Jane and went to speak to him but the testator did not join in the conversation, but did nod his head. The witness, late in the fall of 1961 took her Aunt Lilly, who was six years older than the testator to see him in the new home. The testator said nothing directly to the witness but did talk to Aunt Lilly and said "Don't you remember when you were 12 and I was six? And he kept harping on that one question." The witness was not asked for her opinion on the testator's mental capacity.

The last witness for the caveators was Mrs. Violet Boice, who had been acquainted with the testator for 20 years and had been the testator's bookkeeper for ten years. After the business was sold in 1957 she kept the records of his personal affairs up until October 1960. The witness would write up checks for the testator's signature and he would sign them. At the end of 1960 she observed that the testator would not "say much of anything any more and if you asked him anything, you would have to repeat it over and over to make him understand what you were trying to tell him." She did not have too much contact with the testator in 1961. She did recall that Arthur and Jane brought the testator by to the office to see the witness, and at one time the testator smoked a cigarette so low that it burned his lip. When first asked the question as to whether the testator was "mentally competent to make a valid deed or will on November 11, 1961?", she replied "I don't know whether I could be the person to say whether he was mentally competent to make a will, but I do not think he could remember * * *" Counsel for the caveators struck this answer and the following occurred:

> "Q. Mrs. Boice, you can answer that by saying yes or no that you don't know now, or any other answer that is responsive to the question, but I do believe you should answer the question, do you believe he was mentally competent on November 11, 1961? A. No, he was not competent enough to make a will."

On cross-examination, however, Mrs. Boice testified as follows:

> "Q. Mrs. Boice, didn't you just a moment ago say you didn't know? A. Well, I didn't think—I am no

doctor or nurse and I didn't think I would have the authority to give, that is the reason why I didn't say yes or no.

"Q. So, actually, do you really know? A. I guess not.

"Q. Ma'am,—A. I don't guess I would actually know, no."

We have already discussed Mr. Hall's testimony in connection with the inadmissibility of his opinion in regard to the testator's mental capacity to make a valid deed, contract or will on November 11, 1961. The only other opinion in regard to the testator's mental capacity on the critical date was that of Mrs. Boice and this opinion was weak on her direct examination and entirely repudiated by her on her cross-examination. There was, therefore, no proper "opinion" evidence before the jury on the testator's mental incapacity on November 11, 1961. Nor, in our opinion, does the entire testimony present facts from which the jury could reasonably infer that the testator was not mentally capable of executing a valid deed, contract or will on November 11, 1961.

There was no evidence that the testator was dirty, indifferent about his dress or possessed of unpleasant personal habits indicating any permanent mental incapacity to make a valid deed or contract. At the most the whole testimony for the caveators indicates a man in his eighties, suffering from arteriosclerosis, becoming somewhat deaf, who *at times* suffered from some loss of memory, on one or two occasions burnt his lip by smoking a cigarette too long, and shuffled. Under our decisions already cited this testimony is not sufficient to present to a jury on the issue of mental incapacity. The trial court relied on this Court's opinion in *Lawson v. Ward,* 153 Md. 93, 137 Atl. 479 (1927) stating in its opinion overruling the caveatee's motion for judgment n.o.v. "* * * We conclude that the testimony as to mental capacity in the case of *Lawson v. Ward,* 153 Md. 93, was no stronger than the testimony as to lack of mental incapacity in the case now before the Court, and in that case the Court of Appeals affirmed the lower court in permitting the question of mental capacity to go to the jury." We do not agree. In *Law-*

*son,* there was strong evidence of the permanent insanity of the testator prior to the execution of the will. Judge Bond, for the Court, stated, 153 Md. at 99, 137 Atl. at 481:

> "On the issue concerning mental capacity of the testator, most of the evidence, as has previously been said, detailed instances of forgetfulness, of uncleanliness, and strange behavior on the testator's part, during the two or three months before the execution of the will; and the sufficiency of evidence of that nature, as proof of incapacity to make a valid deed or contract, must, as counsel for the caveator frankly recognize, always be open to some question because the simple capacity requisite for making a will may exist consistently with much strangeness of conduct and decay in the testator. *Mecutchen v. Gigous,* 150 Md. 79, 89; *Jones v. Collins,* 94 Md. 403. And the condition is, in this instance, not a long-established, characteristic condition, but one supposed to have developed in the last six months of the testator's life, and within three or four months of the execution of his will; and this fact makes it necessary to consider whether the jury might infer from the evidence that it was an unchanging condition, and interfered with the testator's capacity at the time of the execution of the will. *Birchett v. Smith,* 150 Md. 369, 377. There was no direct testimony of any abnormal condition just at that time. *Birchett v. Smith, supra.* The evidence, however, pictures a man who not only failed to recognize acquaintances, but became lost several times on the streets of Crisfield, in surroundings familiar to him, permitted his living quarters and his clothing to become almost indescribably filthy, took clothes off to an indecent extent in public places, and once appeared outdoors wholly naked, spent nights singing aloud, was at times uncertain whether it was day or night, and picked up cast-off food from garbage cans and elsewhere, and ate it."

We think the facts in *Lawson* clearly distinguish that case from the case at bar.

There is nothing in the provisions of the will of November 11, 1961 which indicate to us any inference of possible mental incapacity. The law is well established that intrinsic evidence furnished by the will under challenge is always an element to be considered by the jury in determining the sanity of a testator and a will which disregards the blood relations of a testator or other objects of his bounty, while a fact to be considered upon the issue of testamentary capacity, is not, standing alone, sufficient to set aside the will. *Smith v. Shuppner*, 125 Md. 409, 416, 93 Atl. 514 (1915) ; *Sykes, Contest of Wills in Maryland*, Sec. 64, page 82. See also *Sellers v. Qualls*, 206 Md. at 68, 110 A. 2d at 78. We have seen from the prior discussion of the terms of the 1957 will, the 1958 will and codicils, and the November 11, 1961 will of the testator, that the blood relatives of the testator—his brothers, his nieces and nephews and his grandnieces—as well as certain friends were the primary recipients of his estate, although in different amounts. It has been suggested by the caveators that the elimination of the trustees of Mt. Oak Methodist Church, Mitchellville, as one of the residuary legatees in the 1961 will, evidences a suspicious circumstance in view of the testator's long connection both as a member and as an official of that church. This suggestion loses its possible significance when one considers that even in the 1957 and 1958 wills, the primary consideration was given the blood relatives and friends by the testator who thought that the amount of his estate might well be completely exhausted by the specific legacies with nothing left for the church and the American Red Cross as residuary legatees. Then too, the equating by the testator of the American Red Cross, another worthy charity with which the testator is not shown to have any particular or official interest, with the church as a residuary legatee, negatives the idea that the church was considered by the testator as an important object of his bounty. In the 1961 will, the church is bequeathed specifically a legacy of $1000 and the American Red Cross $250, which might well be more than those charities would have received under either the 1957 or 1958 wills had the testator died shortly after making those wills, as the testator was obviously uncertain that the *then* value of his property would be sufficient to give the residuary

legatees anything. In short, there is no intrinsic evidence in the will itself which indicates in any way that the testator was not mentally capable of executing the 1961 will. The terms of the will rather indicate the contrary.

The trial court erred in not having granted the motion of the caveatee for judgment n.o.v. so that the verdict of the jury should have been entered as "Yes" on Issue No. 4 in regard to mental capacity.

(3)

As we view the record in this case there is simply no evidence which would justify the submission of the issue of undue influence to the jury.

The most the evidence shows is that Jane assisted the testator with his affairs, attended to his banking activities and had a general power of attorney which she exercised twice on legitimate matters reasonably connected with the testator's business. The caveators argue that several checks, cashed at a supermarket when the testator lived temporarily with Arthur and Jane at their home in the District of Columbia indicate that Arthur and Jane violated their alleged agreement to support and maintain the testator. We need not pass upon the meaning of the agreement between the testator, Arthur and Jane as there is nothing to indicate that the checks were not voluntarily given by the testator or that he did not himself receive the money from the checks. In short, even on the construction of the agreement urged by the caveators, there is no showing or reasonable inference that the agreement was breached by Arthur and Jane or that this transaction in any way affected or was related to the execution of the will of 1961. Even if it be assumed, *arguendo,* that Jane or Arthur stood in a confidential relationship with the testator and had the power to overbear the will of the testator, there is no evidence that either Arthur or Jane sought to exercise that power. The uncontradicted evidence was that the provisions to be incorporated in the 1961 will were the ideas of the testator and were submitted to counsel who prepared the will from a written memorandum prepared by Jane at the direction of the testator. The testator was not kept in seclusion by Arthur and Jane but had complete access to his friends and relatives who visited him when they wished and saw

him without the presence of either Arthur or Jane. On the morning of November 11, the testator visited his sister-in-law, had an entirely rational visit with her and told her that he was on his way to execute his will. The will was prepared by reputable counsel in accordance with the directions given and the testator conferred with counsel alone about the will before it was executed. The testator was examined by the physician who had previously treated him both before and after the execution of the 1961 will and was found by that physician to be entirely competent to execute a will. This was the very procedure recommended by Mr. Hall who indicated to Jane that if such a certification were made, he, himself, would prepare a will in accordance with the testator's directions. As we have indicated, the will itself is a reasonable one on its face and does not indicate in any way the exercise of undue influence upon the testator by Arthur or by Jane. As Judge Horney, for the Court, in *Arbogast v. MacMillan,* 221 Md. at 521, 158 A. 2d at 100, stated:

> "A careful reading of the entire record fails to disclose that *any* influence—either undue or legitimate—was practiced on the testator by the caveatee. The caveators *seem* to suggest that because the caveatee lived with his father without paying rent (though he paid some of the taxes, utility charges and other household expenses) ; because he looked after the physical needs of his father; because he attended to the business affairs of his father; and because, at the request of his father, he took him to execute a new will, and then arranged to withdraw the old one from safekeeping, that he had in some manner thereby exercised undue influence on the testator. Clearly such facts fall far short of amounting to coercion. Furthermore, there was no showing that the son dominated his father, took away his free agency or prevented the exercise of his own judgment and choice. See *Kennedy v. Kennedy,* 124 Md. 38, 91 Atl. 759 (1914) ; *Sellers v. Qualls,* 206 Md. 58, 110 A. 2d 73 (1954). On the contrary, these facts do not even raise a conjecture or a sus-

picious circumstance, and clearly did not justify sub-
mission of the issue of undue influence to the jury.
*Kuenne v. Kuenne,* 219 Md. 101, 148 A. 2d 448
(1959). Moreover, even if we assume that the son did
in fact have the power to overbear the will of his father,
there is absolutely no evidence that the son ever
undertook to exercise it. See *Woodruff v. Linthicum,*
158 Md. 603, 609, 149 Atl. 454, 456 (1930). Since
there was no evidence of *any* undue influence, the trial
court should have granted the caveatee's motion for a
directed verdict on the issue of undue influence."

In our opinion the facts in the case at bar are even less strong
than those possibly suggesting undue influence in *Arbogast v.
MacMillan, supra.* The trial court erred in not having granted
the motion of the caveatee for a judgment n.o.v. so that the ver-
dict of the jury should have been entered as "No" on Issue
No. 3 in regard to undue influence.

> *Order reversed and judgment n.o.v.
> entered in favor of the caveatee,
> to the end that the verdict of the
> jury on Issue No. 3 shall be "No"
> and on Issue No. 4 shall be "Yes",
> the costs of this appeal to be paid
> by the appellees.*