PHELPS *v.* GOLDBERG, Executor of the Estate
of Charles A. Phelps

[No. 139, September Term, 1973.]

*Decided January 8, 1974.*

The cause was argued before Murphy, C. J., and Barnes, McWilliams, Singley, Smith, Digges and Levine, JJ.

*Thomas E. Webb*, with whom was *Abraham L. Adler* on the brief, for appellant.

*Charles E. Wehland,* with whom was *Ronald S. Goldberg* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

A widow, appellant Janet W. Phelps, here challenges the determination by a trial judge (Mayfield, J.), who heard the case without a jury, that her husband had the requisite testamentary capacity to execute a valid will. After disposing of a stamp collection, a coin collection, musical instruments, and music compositions, and bequeathing $10,000 to a hospital and $20,000 to his secretary, the testator, Charles A. Phelps (Phelps) left the entire residue of his estate to his widow. The will specified relative to the bequest to the secretary that "the payment [was not] . . . to come about at the sacrifice of any property value and foolish loss of money merely for the sake of expediency of payment of the bequest."

The will was executed on July 31, 1970, at a time when Phelps was hospitalized in the District of Columbia. He died on August 4, 1970. The will was admitted to probate in Howard County on April 16, 1971. Mrs. Phelps filed her caveat on October 12, 1971. It is conceded by all parties that Phelps was a resident of Howard County. The trial judge found, and both parties agree, that District of Columbia law is applicable in the determination of testamentary capacity.

It appears that District of Columbia law and Maryland law on the subject of testamentary capacity are virtually identical, if not identical, perhaps as a direct result of the fact that most of the territory comprising the original District of Columbia came from Maryland. District of Columbia Code Annotated, § 18-102 (1973 ed.) provides in pertinent part:

> "A will . . . is not valid for any purpose unless the person making it is . . . , at the time of executing or acknowledging it . . . , of sound and disposing mind and capable of executing a valid deed or contract."

It will be seen at once that this language is virtually the

same as that appearing in Maryland Code (1957, 1964 Repl. Vol.) Art. 93, § 349 providing:

> "No will . . . shall be good and effectual for any purpose whatsoever unless the person making the same be at the time of executing or acknowledging it . . . of sound and disposing mind, and capable of executing a valid deed or contract."

Our current provision, Code (1969 Repl. Vol.) Art. 93, § 4-101, the "new" Art. 93, which would have been applicable were Maryland law to govern, requires simply that a person be "legally competent to make a will." The Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland (1968) said relative to this language:

> "The language 'legally competent to make a will' is substituted for the present language of § 349 (Md) 'of sound and disposing mind, and capable of executing a valid deed or contract', which in turn is similar to the language of 2-501 (UPC). The Maryland Court of Appeals has developed a sound and consistent body of law on the subject of mental capacity to make a will which, in the opinion of the Commission, could be better described by the language 'legally competent to make a will' than by the language presently contained in the statutory provision. See *Sykes*, § 3. In fact, the Commission believes that in view of the substantial amount of decisional law on the subject a restatement of the present language, which would seem to have a little different significance than that attached to it by the Court of Appeals, would not be useful. See *Sykes, Contest of Wills in Maryland*, § 61 at page 72. Thus, the Commission intends to adopt the present Maryland law in connection with legal capacity to make a will, as it has been construed, rather than as it might have been in view of the prior statutory language." *Id.* at 46.

As to the connection between the law of the District of Columbia and the law of Maryland on this subject, the oft cited case of *Barbour v. Moore*, 4 App. D. C. 535 (1894), states:

> "Whether the testator was capable, at the time of executing the paper purporting to be his will, of making a valid deed or contract, is the question, in all such cases as the present, that must be decided. This is the test prescribed by the Maryland Statute of 1798, Ch. 101, in force in this District." *Id.* at 547.

To like effect, *see Rossi v. Fletcher*, 135 U. S. App. D. C. 333, 418 F. 2d 1169 (1969), *cert. denied*, 396 U. S. 1009, 90 S. Ct. 568, 24 L.Ed.2d 501 (1970). Identical language relative to mental capacity for execution of a will appears in our former § 349 and in Chapter 101 of the Acts of 1798, there having been no change in the interim.

In the recent case of *In Re Estate of Weir*, 154 U. S. App. D. C. 404, 475 F. 2d 988 (1973), in applying the District of Columbia statute in a case where a caveat challenged a will for lack of testamentary capacity, the court quoted from *Thomas v. Young*, 57 App. D. C. 282, 284, 22 F. 2d 588, 590 (1927), saying:

> "In this jurisdiction, as in most others, sound and disposing mind simply means that 'the decedent must have had, at the time of execution of the instrument, sufficient mental capacity to dispose of his property or estate with judgment and understanding, considering the nature and character of the estate as well as the relative claims of different persons, who would be the natural objects of [his] bounty.'" *Id.* at 475 F. 2d 991.

*Thomas v. Young* in turn quoted *Berry v. Safe Deposit Co.*, 96 Md. 45, 53 A. 720 (1902), where Chief Judge McSherry said for our predecessors:

> "By the legal standard he who is possessed of sufficient capacity at the time of executing his will to make a disposition of his estate with judgment

and understanding in reference to the amount and situation of his property and the relative claims of the different persons who should have been the objects of his bounty, is mentally competent to make a valid will." *Id.* at 49.

The court in *Weir* also referred to 1 Page, *Wills* §.12.21 (3d ed. 1959). 1 Bowe-Parker, *Page on Wills*, § 12.21 (1960) states:

"The standard of testamentary capacity which has finally been agreed upon, in substance, by the great weight of authority is as follows: Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them." *Id.* at 606.

The latter treatise in turn cites, among other cases, *Sellers v. Qualls*, 206 Md. 58, 110 A. 2d 73 (1954), where Chief Judge Brune said for this Court:

"As stated by Sykes, [*Contest of Wills in Maryland* § 61 at p. 72 (1941)], 'Whether a testator had sufficient mental capacity is determined by a consideration of his external acts and appearances. It must appear that at the time of making the will he had a full understanding of the nature of the business in which he was engaged; a recollection of the property of which he intended to dispose and the persons to whom he meant to give it, and the relative. claims of the different persons who were or should have been the objects of his bounty.' " *Id.* at 66.

In *Webster v. Larmore*, 268 Md. 153, 165, 299 A. 2d 814 (1973), Judge Singley pointed out for the Court that "the classic test" set forth in Sykes is derived from *Davis v.*

*Calvert*, 5 G. & J. 269, 300-01 (1833). Thus we reach the conclusion that there is virtually no difference between the District of Columbia law and the Maryland law relative to testamentary capacity.

In our evaluation of the facts of this case we must bear in mind the standard set forth in *Arbogast v. MacMillan*, 221 Md. 516, 158 A. 2d 97 (1960), where Judge Horney said for the Court:

> "The law presumes that every man is sane and has capacity to make a valid will, and the burden of proving the contrary rests upon those who allege that he lacked mental capacity. *Cronin v. Kimble*, 156 Md. 489, 494, 144 Atl. 698, 700 (1929); *Smith v. Shuppner*, 125 Md. 409, 417, 93 Atl. 514, 517 (1915). Moreover, in the absence of proof of prior permanent insanity, it must be shown that the testator was of unsound mind at the time the will was executed in order to overcome the presumption of sanity. *Acker v. Acker*, 172 Md. 477, 192 Atl. 327 (1937); *Gesell v. Baugher*, 100 Md. 677, 60 Atl. 481 (1905)." *Id.* at 523.

To like effect *see Webster*, 268 Md. at 158; and *Ingalls v. Trustees*, 244 Md. 243, 260, 223 A. 2d 778 (1966).

The will here was originally prepared as a draft of a will and is so labeled. The words "draft of" have been stricken from the top of the first page of the two-page instrument and the initials "CAP" with the date "7/31/70" written opposite this striking.

Item second concerned the musical instruments. This was also stricken with the same initials and date being placed immediately adjacent to it. At the end of that item there was written in "see insert Exhibit 'A' " together with certain other language not readily decipherable on the copy available to the Court, the last words of which, however, read "by consent of Charles Phelps."

Item third provided a bequest to the secretary of Phelps in the amount of $10,000 "if she survive[d] [him] sixty (60) days." This also was stricken with like initials and date

placed along side of it. In parenthesis at the end of that paragraph appears, "See insert Exhibit 'B' — this was changed and deleted by Mr. Charles Phelps."

The fourth, fifth, and sixth items were unchanged.

In the seventh item Weenonah Goldston, previously identified in the instrument as the sister of Phelps, was appointed executrix. As typed, the name was spelled "Wwanenah." This has been stricken with the spelling "Weenonah" inserted above it and the initials "CAP" and the date "7/31/70" adjacent to it. There are several instances in item seventh in which words have been typed, in what was obviously intended to be a rough draft, and then the letter "X" has been typed over the top of the words thus typed in order to eliminate them. In each instance initials and dates have been placed in close proximity to the changes thus made, corresponding to the initials and dates previously mentioned. A similar situation exists relative to item eighth naming an attorney to represent the estate, the same attorney who appears here as personal representative, he having been designated as an alternate executor.

The will as originally drafted covered two pages. At the bottom of the first page appeared the words "Page One of Two Pages." The word "Two" has been stricken and "Five" inserted above it with initials and date similar to that previously described. A similar situation exists on the second page. On that page the name of Phelps is typed under the signature line as "Charles Phelps." The signature immediately above the line is "Charles Phelps," with the signature "Charles A. Phelps" immediately above that.

On the second page appears an attestation clause with space for signatures of three witnesses together with their appropriate addresses. The will is witnessed on page two by James P. Mann, M.D., Roger E. Williams, and Daisy Chun Polissar. Written in longhand on page two between the printed margin on the lefthand side of the page and the edge of the paper, running perpendicular to the typing, is a statement that Mrs. Goldston should be entitled to commissions of 10% "of the entire Estate in payment for her services as Executrix" with reference made by way of

explanation or clarification to "royalties, or any other continuing incomes that may be attendant to [Phelps'] Estate" as being included. There was a further statement in that paragraph that Mrs. Goldston was to "use her discretion about her bequest to Daisey, [Phelps'] sister, and Horace, [his] brother." This has also been initialed and dated.

At the bottom of the third page appears "page 3 of 5" with initials and date. Page three is marked "Exhibit 'A' " at the top of the page. It repeats the prior language of item second relative to a bequest of musical instruments and then in a new paragraph labeled "SECOND" appears a provision that " [i]n addition to musical instruments, additionally any musical composition copyrights or otherwise which may turn out to be usable . . . should be divided between [the person previously named] and SPEBSQA (Barbershop)," with further comment as to the procedure Phelps would like for SPEBSQA to follow.

Page four is marked at the bottom of the page as "Page 4 of 5" with initials and dates similar to the ones previously mentioned. At the top of the page appears "Exhibit 'B' ". This is item third. It makes a bequest to Phelps' secretary, listed in the original as "presently of Dundalk, Maryland," but here referred to as "presently of Woodlawn, Md.," in the amount of $20,000, twice that in the original bequest. The paragraph further provides:

> "I would not want the payment of this bequest to have to come about at the sacrifice of any property value and foolish loss of money merely for the sake of expediency of payment of the bequest. I would insist that the legatee be disciplined in this respect and respect the judgment of the Executrix of this Estate."

A word not readily decipherable was deleted and the words "expediency of" inserted. The word "judgment" was misspelled, and then struck through and written properly. In both instances, initials and dates appear. Page five has at the bottom of it "Page 5 of 5." It was written in longhand, as

were pages three and four. Phelps executed on that page, signing himself as "Charles A. Phelps." An attestation clause appears with the signatures of Daisy Chun Polissar, Roger E. Williams, and Annette Tang, the secretary.

The evidence in the case was summarized by the trial judge:

"Dr. Mann was in charge of the treatment of the decedent while the latter was a patient in a hospital in the District of Columbia. He first saw the patient at the hospital whom he described as being critically ill and suffering from heart failure and arrested tuberculosis. At the time of the patient's examination he was conscious but, according to the doctor, was hostile, aggressive and confused. The patient was in the hospital several days and Dr. Mann saw him on each of those days. He says that the patient was difficult to treat; that he should have remained in the hospital, but was discharged contrary to the physician's advice. Dr. Mann identified his signature as a witness to the will, although he does not recall having seen Mr. Phelps sign the same. In the doctor's opinion Mr. Phelps was psychotic, and at the time of his discharge was not of sound mind, memory and understanding. He says that the patient's mind was failing, and his memory of 'the recent' was bad. The doctor stated that he would not consider the patient to have been competent to make decisions. On cross-examination the witness stated that Mr. Phelps had not mentioned his wife or family. He did know where he was and recognized the witness as his doctor. The patient expressed the feeling that the nurses and interns at the hospital were unsympathetic. On one occasion the patient requested a change of accommodations, and at one time fired his nurses. The witness stated that he would have certified that the patient be committed. The doctor did not know who was present at the time the will was signed. He recalled no contact with the patient's family or friends.

"Mr. Goldberg, an attorney, practicing since 1961, was called to the hospital on July 30, 1970, and engaged in a lengthy phone conversation with Mr. Phelps regarding the will, as a result of which he prepared a draft which he forwarded on the same day. On July 31, 1970 he received a call from Mr. Phelps who wished to discuss the will. He then went to Mr. Phelps' room at the hospital, and at the time Miss Tang was there. She handed the witness the typed portion of the will containing 'strike-overs' and pencil changes. This paper bore Dr. Mann's signature. Several changes in longhand were made which were initialed and witnessed by three or more people, two of whom were hospital employees, and one of whom was Miss Tang, who was Mr. Phelps' private secretary. Mr. Phelps stated what he wished to do and stated that he did not know whether he would be around long enough to have the will typed. Mr. Phelps signed the will which had been intended as a draft, but which was accepted by Mr. Phelps as a final will. Mr. Goldberg says that Mr. Phelps was specific as to how he wished to dispose of his property, and was knowledgeable about the property he owned in Howard County, mentioning that he was about to have that property subdivided. The changes and additions in longhand were written by Miss Tang. The witness was with Mr. Phelps approximately two to three hours. Mr. Goldberg had not known anything about any prior will, although Mr. Phelps had mentioned that he had had a will made in 1963. Mr. Goldberg did not recall Mr. Phelps acknowledging the will except by the witness telling him 'This is your will'.

"Miss Tang, a witness to the will, testified that Mr. Phelps had called her, and at the time she arrived Mr. Phelps was in a happy spirit, stating that Mr. Goldberg was coming with a draft of the will. He then stated that he wished to make some changes. She was with Mr. Phelps on July 31, 1970

for approximately three hours. She says that Mr. Phelps dictated and she made some changes in the will. At the time Mr. Phelps left the hospital he called an ambulance."

These were the only witnesses.

Mrs. Phelps points to *Burleigh v. Miller*, 209 Md. 57, 120 A. 2d 378 (1956), where at pages 68-69 the Court quoted from what is now 32A C.J.S. *Evidence* § 1038 (1964), which states:

"Uncontroverted evidence should ordinarily be taken as true, and uncontradicted evidence which is not improbable or unreasonable cannot be disregarded, even if it comes from an interested witness, and, unless shown to be untrustworthy, is conclusive; but evidence not directly contradicted is not necessarily binding on the triers of fact, and may under proper circumstances be given no weight, as where it is inherently improbable or unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence." *Id.* at 727.

She then says:

"There is nothing in this case to even suggest that Dr. Mann's testimony is untrustworthy, inherently improbable, unreasonable, self-contradictory or inconsistent with facts in evidence. According to *Burleigh*, his testimony is then conclusive.

"Yet, the lower court found that because the pages were initialed, and correctly numbered, Dr. Mann's testimony was 'sufficiently overcome.' "

Were Mrs. Phelps to read on she would see that 32A C.J.S. *Evidence* § 1038 further states:

"However, the evidence relied on to support a verdict must in itself have fitness to induce conviction, even though uncontradicted, since evidence, even though uncontradicted, may lack credibility; the persuasiveness of evidence may on occasion be destroyed by analysis even though

uncontroverted; and a substantial conflict in the evidence may arise although all of the evidence is produced by one party. A fact is not undisputed merely because one or more witnesses testify to it and no one denies it, since it is for the trial court to determine what credence it will give to witnesses. Further, evidence is not regarded as undisputed if it is at variance with the facts and circumstances in the case, or with reasonable inferences therefrom or from the evidence; and reasonable inferences from circumstances or physical facts may outweigh undisputed oral testimony.

"Accordingly, the general rule that uncontradicted evidence cannot be disregarded, or is to be taken as true, is subject to many qualifications and exceptions; and it has even been declared a general rule that the trier of facts may disregard or discount uncontradicted evidence. The common view is that evidence not directly contradicted is not necessarily binding on the triers of the facts, and may, in proper circumstances, provided they do not act arbitrarily, be disbelieved and given no weight; and, accordingly, provided they do not act arbitrarily, the triers of the facts are at liberty to reject the evidence in its entirety, as where the uncontradicted evidence is based on hearsay." *Id.* at 735-41.

Although Dr. Mann's testimony was the only opinion in evidence on the issue of testamentary capacity, there was other evidence on the subject, since, as observed for the Court by Judge Barnes in *Ingalls v. Trustees*, 244 Md. 243, 267, 223 A. 2d 778 (1966), "The law is well established that intrinsic evidence furnished by the will under challenge is always an element to be considered by the jury in determining the sanity of a testator . . . ." It is elementary that the trier of fact is not obliged to believe all that he or it hears. *Racine v. Wheeler*, 245 Md. 139, 144, 225 A. 2d 444 (1967).

The trier of fact in making his determination as to

whether Phelps was mentally capable of making a valid will knew that the test was whether Phelps had "sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he [was] about to dispose, and nature of the act which he [was] about to perform, and the names and identity of the persons who [were] to be the objects of his bounty, and his relation towards them." He heard the expert opinion of the physician. In weighing that testimony he may well have noted that when Dr. Mann was asked if he was told the document he was witnessing was a will, he answered:

> "No, I just don't recall the details. I, I just have a vague recollection there were some papers and it was my impression that it was necessary, like a power of attorney, to release some money so that they could pay his bills, but I don't honestly recall that it was a will, and I'm ashamed to say I did not read it."

When asked if he would have witnessed a power of attorney, Dr. Mann said:

> "I wouldn't have witnessed anything if I'd have been thinking at the moment. To me it was all a very embarrassing mistake."

The words "attestation clause" are clearly typed in capital letters on page two of the document witnessed by Dr. Mann. These words appear immediately above the paragraph below which Dr. Mann signed. That paragraph or attestation clause in conventional language referred to "Testator" not once, but twice. It also referred to "Last Will and Testament."

The trial judge heard the testimony of the attorney who prepared the will that Phelps "was very knowledgeable about the property, the real property, in Howard County that he owned, and indicated that it was very valuable and he was about to have it subdivided and that he had just been in the process of having plats or surveys made of it to do so,"

a statement corroborated in part by the claim filed in the estate by land surveyors, including a copy of a letter they wrote Phelps under date of July 2, 1970, less than a month before Phelps wrote his will, setting forth the most recent charges. In addition to this, the trier of fact had before him the "intrinsic evidence furnished by the will under challenge." From the will he could learn that the residue of the estate was left to the widow; that Phelps was conscious of a sister named as executrix and that he corrected a misspelling of her rather unusual name; that he was aware of his musical instruments; that he had in mind certain specific ways in which he thought the organization of "barbershop" quartets (SPEBSQA) should operate; that he was conscious of his stamp and coin collections which he left to his sister; that he carefully initialed and dated many changes in the will, including correction of misspellings and changes of page numbering; that on page two he wrote his name as typed "Charles Phelps," but immediately above that wrote "Charles A. Phelps," the manner in which he signed on the last page; and that he manifested a concern for his estate and surviving spouse when he said that the payment of the bequest to the secretary should not "come about at the sacrifice of any property value and foolish loss of money merely for the sake of expediency of payment of the bequest."

It must be borne in mind that the burden of proof in this case was upon those attacking the testamentary instrument, that is, those who sought to establish that Phelps lacked testamentary capacity. As we observed in *Eidelman v. Walker & Dunlop*, 265 Md. 538, 545, 290 A. 2d 780 (1972), "For many years juries have been instructed at the request of defense counsel to the effect that if the evidence on a given proposition left their minds in a state of even balance or equipoise, then their verdict should be for the defendant because the plaintiff had not met his burden of proof. . . . A judge sitting as a trier of fact is not expected to go further in reaching a conclusion from the evidence before him than a jury."

We perceive no error on the part of the trial judge in his

determination that Phelps had the requisite testamentary capacity to execute a valid will. Maryland Rule 886 is applicable.

*Judgment affirmed; appellant to pay the costs.*